IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 15, 2005

## STATE OF TENNESSEE v. DARRELL TOOMES

**Appeal from the Circuit Court for Lauderdale County**
**No. 7659      Joseph H. Walker, Judge**

───────────────

**No. W2005-00517-CCA-R3-CD  - Filed December 16, 2005**

───────────────

A Lauderdale County jury convicted the defendant, Darrell Toomes, of aggravated rape and aggravated criminal trespass in connection with the June 23, 2002 home invasion of Mamie Milliman's residence in Ripley, and the assault of Ms. Milliman.  The trial court sentenced the defendant to 11 months and 29 days for aggravated criminal trespass and 23 years as a violent offender for the aggravated rape conviction.  On appeal, the defendant challenges the sufficiency of the evidence supporting his aggravated rape conviction and claims that his 23-year sentence for that conviction is excessive.  We affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court are Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which J.C. MCLIN, J., joined. NORMA MCGEE OGLE, J., concurred in results only.

Gary F. Antrican, District Public Defender; and Julie K. Pillow, Assistant Public Defender, for the Appellant, Darrell Toomes.

Paul G. Summers, Attorney General & Reporter; Brian C. Johnson, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey A. Brewer, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

Taken in the light most favorable to the state, *see State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983), the evidence at trial showed that Mamie Milliman, the victim, was 83 years old and lived alone at 226 Keller Avenue in Ripley, Tennessee.  The victim testified that in the early morning hours of June 23, 2002, she was awakened by a hand being placed over her face.  The intruder removed nylon hosiery from the top of her dresser and tied her hands to the bed.  Ms. Milliman testified that the intruder repeatedly told her, "Be quiet, and I won't hurt you."  The intruder also asked if she had any money.

The intruder removed the victim's pajama bottoms, raped her, and left. The victim waited a few minutes to be certain that the intruder was gone, and she tried to use her telephone to summon help. The telephone cord was missing, so Ms. Milliman walked to the house of her neighbors, Martha and Curtis Gause. The Gauses called the police, and they reached the victim's brother who picked up the victim and drove her to the emergency room at Lauderdale County Baptist Memorial Hospital. Ms. Milliman was examined by a physician, and after she was discharged, she first went to her brother's house and then later back to her own home. Ms. Milliman determined that a coin collection and a small amount of money were missing.

Ms. Milliman did not know the identity of her attacker, and she could not identify at trial the defendant as the person who assaulted and raped her.

On cross-examination, Ms. Milliman said that she only saw the attacker's silhouette from light coming in through her bedroom window. She believed that the man was "tall," but otherwise, she could not determine what clothing he wore or even what race he was. She recalled that at one point, the man placed a pillow over her face. Regarding her injuries, Ms. Milliman testified that "it kindly hurt" and that she "just knew [she] burned and hurt down there." Additionally, after her physical examination, Ms. Milliman realized that she was bleeding.

The victim's neighbor, Martha Gause, testified about the victim coming to her house for help. Ms. Gause described the victim as "shaking and crying and real red, just real shaken up, very terrified." Ms. Gause also noticed redness around the victim's wrists. Ms. Gause and her husband tried to calm the victim, and they sat with her until the police arrived.

When the victim was taken to the hospital, medical technologist Beverly Bullard drew blood from the victim for the police investigation. Ms. Bullard testified that she was trained to document all of her lab work and activities to establish an accurate chain of custody. On cross-examination, Ms. Bullard explained the procedure that she follows whereby an officer will hand her a police kit for drawing blood, and she will draw the blood in the officer's presence, label the tubes, sign the police paperwork, and give the blood directly to the officer. Although Ms. Bullard had no independent memory of drawing blood from the victim, Ms. Bullard insisted that unless an officer was present, she would not have drawn blood.

The medical records custodian for Baptist Memorial Hospital, Cheryl Manns, introduced Ms. Milliman's patient records from June 23, 2002. The state established a foundation to admit the records as "business records," and Ms. Manns testified from the records that Ms. Milliman arrived at the hospital at 3:52 a.m. The nursing notes recorded the victim's height as five feet and weight as 110 pounds. The physical examination part of the records showed "Pelvic: Positive bleeding, lower edge of vagina." The victim reported to the medical staff that she had been "held down by single individual and raped." The sexual assault examining physician noted in his records attempted anal penetration, successful vaginal penetration, and "[b]leeding from the lower edge of frenulum."

Doctor Pankaj Strivastava was the victim's examining physician. He corroborated the victim's injuries as reported in his hospital notes, and he explained the procedure he followed to collect pubic hair combings and anal and vaginal swabs for the police investigation. The nurse who assisted Dr. Strivastava with the rape examination was Michelle Thompson. She testified and identified the rape kit used for the victim; the items and documentation inside the kit bore her handwriting, and she had given the rape kit to Officer Mitchell.

Ripley Police Officer Terrence Mitchell was the first officer dispatched to investigate the rape. He interviewed the victim and collected evidence from the victim's bedroom. Officer Mitchell took a pillow case, mattress cover, bed linens, nylon stockings, and a telephone, and he identified these items at trial. He testified that the nylon stockings were knotted, and one of the stockings was tied to the bed rail when he found it. Officer Mitchell also confirmed later receiving the rape kit directly from hospital nurse Thompson. As part of his investigation, Officer Mitchell delivered the rape kit to the Tennessee Bureau of Investigation Crime Laboratory for analysis.

On cross-examination, Officer Mitchell testified that Ms. Milliman described her attacker as "about medium build" and "real soft spoken and polite." He thought that Ms. Milliman told him that she was unsure whether the attacker had penetrated her. Officer Mitchell agreed that the only evidence submitted for analysis was the rape kit. He was unable to lift any fingerprints from the telephone, and the other items were kept in evidence storage. He also found no evidence of a forced entry into the residence, and when he questioned Ms. Milliman, she speculated that she may have mistakenly left the door unlocked.

The defense established through Officer Mitchell that the case remained "unsolved" for approximately one year. The rape kit was not submitted for testing until almost one month after the assault. Officer Mitchell explained that the kit, containing the samples, was kept in a refrigerator in the evidence room; however, he did not know how quickly refrigerated samples would begin to degrade.

On redirect examination, Officer Mitchell testified that shortly after the rape, he was reassigned as a school resource officer and no longer headed up the case. The officer said that he was familiar with the defendant and the defendant's family because they all grew up in the same neighborhood. Officer Mitchell knew that the defendant had a twin brother.

Ripley Police Lieutenant Steve Sanders testified that his first involvement with the case was two days after the assault when he spoke with the victim at her home. At that time, the victim mentioned that a coin collection was missing. The first solid lead in the case occurred when the TBI Crime Lab identified DNA collected in the rape kit as matching that of Terrell Toomes. Lieutenant Sanders learned, however, that Terrell Toomes was incarcerated at the time of the rape. Upon further investigation, Lieutenant Sanders discovered that the defendant and Terrell Toomes were twins. As a result, Lieutenant Sanders secured a search warrant to obtain a blood sample from the defendant. The officer was present when the blood was drawn; he took custody of the sample and transported it to the TBI Crime Lab for analysis.

The report of analysis showed that DNA collected from the victim's anal swabs matched that of the defendant and his twin brother. Thereafter, the defendant was arrested for the rape of Ms. Milliman.

On cross-examination, Lieutenant Sanders admitted that an initial analysis of the victim's anal swabs performed in August 2002 detected no DNA matches. Approximately one year later, however, a DNA match to the defendant's brother was discovered. Lieutenant Sanders could not explain the discovery other than speculate that the twin brother's DNA was not in the FBI data bank when the first analysis was submitted.

The state qualified TBI Special Agent Lawrence James as an expert in DNA analysis and serology. He testified that DNA is unique to each person with the exception of identical twins. Agent James received and analyzed the rape kit containing the samples recovered from the victim. He detected spermatozoa on the anal swabs and proceeded to perform DNA testing.

Agent James explained that the FBI maintains a DNA database known as CODIS. Approximately 130 laboratories contribute DNA profiles to the database, which is designed to compare profiles to determine DNA matches. In Tennessee, all convicted felons are required to provide blood samples that are subsequently analyzed and entered into the database. Because of the volume of samples, the TBI does not "do the DNA typing on the convicted offender samples." Instead, the samples are sent to another laboratory that then reports the results to the TBI. The TBI performs random checks to verify the accuracy of the results.

Agent James testified that no DNA match was reported the first time that the victim's anal swabs were submitted to CODIS. Sometime later, however, he was notified that there had been a "hit" with the DNA profile of Terrell Toomes. Agent James advised Lieutenant Sanders of the development, but after Lieutenant Sanders investigated the matter, he reported to Agent James that the identified individual had been incarcerated at the time of the rape. Agent James said that he was "dumbfounded," but approximately one day later, Lieutenant Sanders notified him that Terrell Toomes had a twin brother. At that point, Agent James directed the lieutenant to obtain a blood sample from the twin brother, which was done. When Agent James then analyzed the defendant's blood sample, he matched the defendant's DNA profile to the profile obtained from the victim's anal swabs. Statistically speaking, Agent James related that the probabilities of finding the defendant's profile within the African-American population was 1 in 5 billion, 128 million; within the Caucasian population it was 1 in 22 billion, 870 million; within the Southeastern Hispanic population it was 1 in 90 billion, 910 million, and within the Southwestern Hispanic population it was 1 in 185 billion, 700 million.

On cross-examination, Agent James explained that the CODIS system runs weekly. Every Tuesday, CODIS uploads the profiles in the local TBI database to make a comparison against the national database. The local profiles stay in the CODIS database, and they are automatically compared on a weekly basis. Agent James testified that whenever a "hit" turns up in the CODIS system, an FBI agent who is designated a "specimen manager" will email him about the

development. Agent James confirmed that the DNA profile submitted in connection with Ms. Milliman's assault was checked on a weekly basis until the "hit" was reported in July of 2003.

The defense explored with Agent James an unusual CODIS reporting delay. A TBI coworker had performed work on a 2000 case involving a known blood profile taken from the defendant's twin brother, but the DNA profile evidently was not entered into the CODIS database until approximately two years later. Agent James testified that his office did not connect electronically with CODIS until sometime during 2002. At that time, Agent James and his coworkers pulled profiles from every file and entered the profiles into the CODIS system. Because the records showing when the profiles were entered into the CODIS system were at the TBI laboratory, Agent James could not provide a specific entry date for the Terrell Toomes's profile.

The state called Warden Glenn Turner as its last witness. Mr. Turner was the records custodian for the Hardeman County Correctional Facility, and he identified the correctional facility records for Terrell Toomes, the defendant's brother. The records showed Terrell Toomes's date of birth as September 17, 1980. Terrell Toomes was transferred from the West Tennessee State Penitentiary to the Hardeman County Correctional Facility on March 26, 2001. Mr. Turner verified that Terrell Toomes was incarcerated at the Hardeman County Correctional Facility on June 23, 2002.

The defense presented no testimony, and based upon the evidence presented at trial, the jury found the defendant guilty of aggravated rape and aggravated criminal trespass and not guilty of aggravated kidnapping or misdemeanor theft. At a separate sentencing hearing conducted on October 15, 2004, the trial court ordered the defendant to serve an effective sentence of 23 years.

## I. Sufficiency of the Evidence

We discern from the defendant's brief on appeal that his only evidence-sufficiency challenge is to the aggravated rape conviction. Accordingly, we confine our analysis to that conviction.

Our standard of review of evidence sufficiency is well settled. On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Williams*, 657 S.W.2d at 410. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *Liakas v. State*, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal

defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992).

A criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973); *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 456-58 (1958); *State v. Hailey*, 658 S.W.2d 547, 552 (Tenn. Crim. App. 1983). If entirely circumstantial, the facts and circumstances must "be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610, 612 (1971). In such an event, the circumstantial evidence must be both consistent with guilt and inconsistent with innocence. *Pruitt v. State*, 3 Tenn. Crim. App. 256, 460 S.W.2d 385, 390 (1970). The weight of the circumstantial evidence is for the jury to determine. *Williams v. State*, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1974) (citing *Patterson v. State*, 4 Tenn. Crim. App. 657, 475 S.W.2d 201 (1971)). The court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases. *Liakas*, 286 S.W.2d at 859; *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). The same standard of review is applicable whether the guilty verdict was based upon direct evidence or upon circumstantial evidence. *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 208 Tenn. 75, 343 S.W.2d 895, 897 (1961).

As relevant to this case, an individual commits the offense of aggravated rape by "unlawful sexual penetration of a victim" causing "bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(2) (2003). Code section 39-11-106(a)(2) provides that "'[b]odily [i]njury' includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id*. § 39-11-106(a)(2).

We are confident that a rational jury could conclude from the evidence in this case that Ms. Milliman was the victim of unlawful sexual penetration that caused her bodily injury. The defendant argues that the proof of bodily injury was "minimal at best." The state disagrees and points to the victim's testimony that her lower organs "kindly hurt" and that she "just knew [she] burned and hurt down there" and to Dr. Srivastava's diagnosis of "[p]ositive bleeding, lower edge of vagina" and "[b]leeding from the lower edge of frenulum." *See State v. McPherson*, 882 S.W.2d 365, 369 (Tenn. Crim. App. 1994) (bodily injury consisted of scratches on the victim's neck, a bruise on her leg, a "busted lip," and a broken scab).

Even though the evidence was sufficient to prove that Ms. Milliman was assaulted and was the subject of aggravated rape, the matter does not end. The state was obligated to prove beyond a reasonable doubt that the defendant was the person who committed the crime in question. *See State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995); *White v. State*, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975). This is a question of fact for the determination of the jury following consideration of the proof submitted at trial. *White*, 533 S.W.2d at 744; *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

There is no direct evidence of the defendant's guilt in this case. The victim was unable to identify the defendant – or anyone else – as her assailant, and no witnesses placed the

defendant in or around the victim's residence at the time of the home invasion. The defendant made no statements to the investigating officers and did not testify at trial or at sentencing. The state was unable to connect the items that the victim claimed were taken from her residence to the defendant, and we note that the jury found the defendant not guilty of theft of property. The only – and we emphasize *the only* – evidence connecting the defendant to the victim's rape is the DNA results.

The state insists that the defendant has waived any evidence sufficiency argument other than his attack on the evidence of bodily injury. We are not inclined, however, to view evidence sufficiency so narrowly.

The question whether DNA evidence is sufficient to support a conviction without further corroborative proof appears to be a question of first impression in this state.[1] Certainly, DNA evidence is admissible in Tennessee. In 1991, the legislature enacted a statute to admit DNA evidence "without antecedent expert testimony that DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material." Tenn. Code Ann. § 24-7-117(b) (1994). Full admission of DNA analysis into evidence, however, is conditioned "upon a showing that the offered testimony meets the standards of admissibility set forth in the Tennessee Rules of Evidence." *Id.* Three methods of DNA analysis have been held admissible pursuant to the statute: (1) the restriction fragment length polymorphism (RFLP) method, (2) the polymerase chain reaction (PCR) method, and (3) the mitochondrial DNA (mtDNA) method. *See State v. Scott*, 33 S.W.3d 746 (Tenn. 2000); *State v. Begley*, 956 S.W.2d 471 (Tenn. 1997).[2] Admissibility, however, is not the issue in this case; sufficiency of the evidence is.

We have canvassed numerous cases in this state involving DNA identification evidence, but rulings of evidence sufficiency invariably have referenced other corroborating evidence. *See, e.g., Douglas F. Jordan, Jr.*, No. E2003-02159-CCA-R3-CD (Tenn. Crim. App., Knoxville, May 17, 2005) (evidence was marginally sufficient to support homicide conviction; defendant acknowledged he was angry with the victim, defendant's blood found on victim's bra and overalls, and his DNA found under her fingernails); *State v. Dee W. Thompson*, No. M2003-01149-CCA-R3-CD (Tenn. Crim. App., Nashville, June 23, 2004) (evidence sufficient to sustain aggravated rape conviction; victim identified defendant, rectal swab of victim contained DNA consistent with defendant's DNA, and police recovered wooden stick with metal tip that matched description given by victim); *State v. Bobby Shellhouse Jr.*, No. E2001-01604-CCA-R3-CD (Tenn. Crim. App., Knoxville, Oct. 3, 2002) (evidence sufficient to sustain sexual battery; DNA obtained from defendant's blood swatch matched saliva on victim's underwear

---

[1] Pending before the supreme court is the issue whether blood drawn from a prisoner without a warrant and used in a DNA database constitutes an unreasonable search. *State v. Bruce Warren Scarborough*, No. E2004-01332-CCA-R9-CD (Tenn. Crim. App., Knoxville, June 2, 2005), *perm. app. granted* (Tenn. Oct. 3, 2005). This court had accepted interlocutory review of the issue, and although the case has not been tried on its merits, it appears preliminarily that DNA evidence may be the only direct support for the aggravated rape charges.

[2] Agent James did not identify the method of DNA analysis used in this case.

and minor identified defendant as perpetrator); *State v. Albert Yarbrough*, No. W2001-01150-CCA-R3-CD (Tenn. Crim. App., Jackson, Apr. 12, 2002) (victim's description of defendant, although varied, coupled with a DNA match sufficient to sustain rape conviction); *State v. Lonnie Turner*, No. M1999-01127-CCA-R3-CD (Tenn. Crim. App., Nashville, June 5, 2001) (evidence sufficient to sustain felony murder and aggravated rape convictions because handwriting on the victim's body matched defendant's handwriting, the DNA found in the victim's body matched defendant's extremely rare DNA, and an inmate testified that defendant stated that he did not mean to kill the victim).

We know that in the context of "confessions," it has long been recognized that a defendant's confession must be corroborated by independent evidence which tends to establish the *corpus delicti*. *E.g., Ashby v. State*, 124 Tenn. 684, 697-98, 139 S.W. 872, 875 (1911); *State v. Turner*, 30 S.W.3d 355, 358-59 (Tenn. Crim. App. 2000). Additionally, "the mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). On the other hand, the question of identification of a defendant as the person who committed the offense is a question for the jury, and a victim's identification alone is sufficient to support a conviction. *See State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

The various rationales behind the cases cited above do not strike us as particularly helpful or appropriate in the context of DNA analysis. Instead, we believe that the most apt analogy is the use of "fingerprint identification." In *Jamison v. State*, 209 Tenn. 426, 354 S.W.2d 252 (1962), the supreme court grappled with the issue whether fingerprint evidence alone is sufficient to support a conviction. The court concluded that corroborating evidence was not required in a circumstantial evidence case based on fingerprint identification. The court explained,

> [A]ll the fingerprints that have ever been taken as far as reported cases are concerned run into an infinite number and no two have ever been found alike. The courts generally have reached the conclusion that evidence of this kind is infallible because of its conclusiveness.
>
> From what has been said above it is obvious that we have reached the conclusion that this evidence of the fingerprints of this man on this machine is conclusive and sufficient evidence to establish his guilt as the one who entered and burglarized this building. There is no evidence to show that he was in or around or near or had access to the machine where he could have had his hands on it, and this being true if the fingerprints were true and there is no debate about the fact that these are his fingerprints because he freely allowed them to take his fingerprints after he was arrested, and his fingerprints which were made after he was arrested and those of his that were on file in the Federal Bureau of Investigation were all the same and these were exhibited in a blown-up manner, that is the fingerprints were

enlarged so that you could very easily see the different marks, and were exhibited to the jury. We thus must conclude that this is sufficient evidence and there is no doubt under this record in our mind but that the man was guilty and the judgment must be affirmed.

*Id*. at 434, 354 S.W.2d at 255; *see also State v. Richmond*, 7 S.W.3d 90 (Tenn. Crim. App. 1999); *State v. Evans*, 669 S.W.2d 708 (Tenn. Crim. App. 1984).

From *Jamison*, we distill two important considerations. First, fingerprint identification evidence is unquestionably reliable, although we hesitate to characterize it as absolutely infallible. Second, the accessibility of a defendant to the examined object is highly relevant because it could suggest an innocent reason for a defendant's fingerprints to be on an object.

In this instant case, we cannot conceive of an innocent reason for the defendant's DNA to be found on swabs taken from the victim's anal area. Therefore, in our opinion, accessibility is not an important consideration regarding the sufficiency of the evidence based on DNA analysis.[3] In terms of the reliability of DNA analysis, we again hesitate to describe it as absolute or infallible, nor do we believe that any properly qualified expert in the field of DNA analysis would represent it in such a fashion. Nevertheless, DNA analysis represents a scientific breakthrough of unquestionable integrity, as recognized by Code section 24-7-117(b), which authorizes the admission of DNA evidence "without antecedent expert testimony that DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material." Tenn. Code Ann. § 24-7-117(b) (1994). Agent James, we note, testified that probabilities of finding the defendant's profile within the African-American population was 1 in 5 billion, 128 million; within the Caucasian population it was 1 in 22 billion, 870 million; within the Southeastern Hispanic population it was 1 in 90 billion, 910 million, and within the Southwestern Hispanic population it was 1 in 185 billion, 700 million. The confluence of these factors persuades us that the evidence was sufficient to support the defendant's conviction for aggravated rape.[4]

Finally, we add, as a postscript of sorts, that other jurisdictions have examined the same evidence sufficiency issue as presented in this case. Our conclusion is in general accord with the published decisions of those jurisdictions. *See generally People v. Soto*, 30 Cal. App. 4th 340, 35 Cal. Rptr. 2d 846 (Cal. Ct. App. 1994), *aff'd*, 981 P.2d 958, 21 Cal. 4th 512 (Cal. 1999); *People*

---

[3] Even though the defendant had a living, identical twin, in our opinion the state effectively excluded the twin as the source of DNA based on the twin's incarceration at the time of Ms. Milliman's rape.

[4] By our holding, we are not announcing an iron-clad principal that DNA evidence, without corroboration, is always sufficient to support a conviction. Practically infinite factual variations can arise, and we do not intend by our opinion to prejudge other factual scenarios. For instance, this case has an unusual feature in that two separate DNA comparisons were performed. The first comparison identified the twin's DNA, and the second comparison identified the twin's and the defendant's DNA, which were identical, thereby reinforcing the integrity of the comparisons. In our opinion, it is quite sufficient in this case to recognize and respect the admissibility of DNA evidence and to conclude that the evidence was sufficient to support the defendant's aggravated rape conviction.

*v. Rush*, 165 Misc. 2d 821, 630 N.Y.S.2d 631 (N.Y. Sup. Ct. 1995), *aff'd*, 242 A.D.2d 108, 672 N.Y.S.2d 362 (App. Div. 1998); *Roberson v. State*, 16 S.W.3d 156 (Tex. App. 2000); *Springfield v. State*, 860 P.2d 435 (Wyo. 1993).

## II.  Sentencing

We quote from the defendant's brief the entire argument that his sentence of 23 years is excessive:

> The Court sentenced the defendant to 23 years on the Aggravated Rape Conviction.  The Court found that the defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range.  (T. sentencing 12).

> T.C.A. 40-35-102(1) states that every defendant shall be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense.

> The terms of sentencing must be reasonably related to the severity of the offenses committed.  In the case here in question, defendant received twenty-three years.  Based on his record as a whole, this sentence does not match the severity of the offenses for which he is convicted.

We have reviewed the transcript of the defendant's sentencing hearing, and there is ample evidence that the trial court considered the sentencing principles and all relevant facts and circumstances.  Therefore, we review its decision *de novo* with a presumption of correctness.  So long as the trial court complied with the purposes and procedures of the 1989 Sentencing Act and its findings are supported by the factual record, this Court may not disturb this sentence even if we would have preferred a different result.  *See* Tenn. Code Ann. § 40-35-210 (2003); *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The defendant's sentence is appropriate, and we decline to disturb that sentencing decision.

In conclusion, we hold that the evidence at trial was sufficient to support the defendant's conviction and that no errors appear in the defendant's sentencing.  We therefore affirm the judgments of the lower court.

_____
JAMES CURWOOD WITT, JR., JUDGE