IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 10, 2011 Session

**STATE OF TENNESSEE v. ROBERT JASON BURDICK**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-B-1350      Seth Norman, Judge**

**No. M2010-01726-CCA-R3-CD - Filed June 13, 2012**

Defendant, Robert Jason Burdick, was indicted by the Davidson County Grand Jury for especially aggravated kidnapping and aggravated rape. Defendant was convicted as charged by a jury and sentenced by the trial court to concurrent sentences of 20 years for each conviction. Defendant appeals his convictions and asserts that: 1) the evidence at trial was insufficient to support his convictions; and 2) the trial court erred by limiting Defendant's cross-examination of a State's witness and by denying Defendant the opportunity to make an offer of proof of his excluded cross-examination. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

David A. Collins, Nashville, Tennessee, (on appeal); and Fletcher Long, Carrie Gassaway, John Herbison, and Ed Farmer, Nashville, Tennessee, (at trial) for the appellant, Robert Jason Burkick.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paducah Stempel, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; Roger Moore, Assistant District Attorney General; Dan Hamm, Assistant District Attorney General; and Dina Shabayek, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

*Facts*

We will not refer to the victims of these offenses by their names. In order to distinguish the two victims in this case, we will refer to the victim of the aggravated rape as "the daughter" and the victim of the especially aggravated kidnapping as "the mother."

On the evening of February 17, 2000, the mother was visiting the daughter's home in Nashville. The daughter, her mother, and the daughter's three young children were present at the daughter's home. After the children went to bed, the daughter and her mother visited, and the mother went to bed between 9:30 and 10:00 that night. The mother was awakened sometime after 1:00 a.m. when the light in her room was turned on. She saw a man standing in her doorway. He was wearing a mask and a dark jacket and dark pants. She screamed. The man came toward her bed, leaned over her, and drew a gun. He put his hand over her mouth and whispered to her to stop screaming. She stopped screaming, and the man told her to get up. He said, "we're going to your daughter's room" and put the gun to her neck. He walked behind her, with his hand over her mouth and a gun pointing to her neck, and he pushed her through the doorway and toward the daughter's room. The mother testified that the man had a "very distinct" odor of oil or gas, and he smelled like a mechanic. The daughter's bedroom door was locked. The man whispered to the mother to tell the daughter to open the door and that he had a gun. She tapped on the door and asked her daughter to open it, telling her daughter that the man had a gun. The daughter opened the door.

The intruder then ordered both of the victims to lie down "face first" on the floor with their arms stretched out in front of them. He then tied each victim's hands together with plastic ties and put duct tape over their eyes. The daughter heard one of her children's footsteps in the hallway, and Defendant instructed the mother to go comfort the children. He walked behind her and pushed her to the children's bedroom door. He left her hands tied and eyes covered. She went into the children's room and sang and prayed with them and was able to comfort them. While she was with the children, she heard "moaning" coming from the daughter's bedroom. Shortly thereafter, she heard water running. She found the daughter in the bathroom, still bound, stepping out of the shower, and learned that Defendant had fled. The mother went to the kitchen to get scissors to free herself and her daughter from the plastic ties, and she saw a crowbar in the kitchen. She also looked at a clock and saw that the time was sometime between 4:00 and 4:30 a.m.

The daughter testified that she went to bed sometime between 11:00 p.m. and 12:00 a.m. She was awakened at approximately 3:00 a.m. by the sound of her mother screaming. She went to her mother's bedroom to check on her. The door was "wide open" and the light

was on. She saw a person dressed in black leaning over her mother's bed. She went back to her bedroom and attempted to call 911, but there was no dial tone. She testified that she knew the phone had been working earlier that night because she received a "hang up call" at approximately 11:00 p.m. She then "almost immediately" heard a knock on her bedroom door, and her mother said, "he's got a gun, open up." The daughter opened the door and immediately saw "a gun in [her] face." She testified that it was a small handgun. The intruder was wearing a ski mask and dark clothing. He ordered them to lie on the floor, and he bound her hands behind her head and put duct tape over her eyes. She testified that "[t]here was lots of crying and prayers," and that she tried to comfort her mother at one point, and she was struck on the back of her head. After the man took her mother to the children's room, he returned and put the daughter on the bed, pulled her shirt over her head, "tried to kiss [her], forcefully spread [her] legs apart, climbed on top of [her] and proceeded to have sexual intercourse." Before the attack, he told the daughter that "this would be the best fuck [she] ever had." She testified that he smelled "as if he'd been handling tools." When he tried to kiss her, she could not feel the ski mask. She testified that she "could see enough under the slits that this was a white man." She described her assailant as having a "stocky" build and "broad shoulders" and that he was approximately 5 feet 8 inches tall.

After the attack, he led her into the bathroom, put her in the shower and turned on the water and left. Before he left, he told the daughter that he knew her ex-husband. Her mother then entered the bathroom, and the daughter remembered that she had a cell phone in her car and told her mother to get it. Her mother brought the phone to her, and the daughter called the police.

Officer John Knowles was on patrol in the area that night and was the first officer to respond to the scene at 3:51 a.m. Several other Metro Nashville Police officers and detectives also worked the scene. Officers searched the area around the residence but did not locate a suspect. They determined that there was a forced entry into the home through the back door and recovered a crowbar from the kitchen counter. They also confirmed that the phone line had been cut. Officer Johnny Lawrence discovered a partially unscrewed lightbulb from the back porch area that had fabric impressions, "which is a good indication gloves or some type of fabric was used on the light bulb." He processed the scene for latent prints but did not find any. He also recovered duct tape, and the sheets from the daughter's bed.

Sandy Myers, a nurse practitioner at Nashville General Hospital, performed a medical exam on the daughter the morning after the attack. She collected a rape kit, including a pubic hair combing and swabs from the daughter's vagina, labia and inner thigh, which she sent to the TBI. Detective Kent McAlister was assigned to the Sex Crimes Unit of the Metro Nashville Police Department in 2001. He investigated the incident in this case. The

investigation lasted several years, during which time Detective McAlister estimated that approximately 50 individuals submitted DNA samples to compare to the DNA samples collected from the daughter, but there were no matches. In May, 2008, Defendant was developed as a suspect. Pursuant to a search warrant, Detective Jeff Wiser collected DNA samples from Defendant, which he submitted to the TBI Crime Lab. Agent Constance Howard, of the TBI Crime Lab, testified that she detected sperm on the daughter's labia swab, from which she obtained a DNA profile. In May of 2008, she compared that DNA sample with the one taken from Defendant, and determined that they matched. Agent Howard concluded that "[t]he probability of an unrelated individual having the same DNA profile from either the African-American, Caucasian, Southeastern Hispanic, or Southwestern Hispanic populations exceeds the current world population."

Defendant did not testify. Dr. Ronald Acton testified on behalf of Defendant as an expert in DNA analysis. He testified that a "false positive" can occur when there are errors in DNA comparison and that replication of testing helps to eliminate those errors. He testified that the DNA profile obtained from the swab of the daughter's labia was incomplete because it contained only 12 of 13 loci. He also testified that the FBI database relied upon by the TBI was out of date.

The State called Agent Joe Minor, a forensic scientist supervisor at the TBI Crime Lab, as a rebuttal witness. Agent Minor testified that Agent Howard's analysis in this case was reviewed by another analyst before being released. He testified that in order for a DNA profile to be accepted into the Combined DNA Index System database, which is maintained by the FBI, it must contain at least ten alleles. Agent Minor disagreed with Dr. Acton's opinion that a match of 12 DNA loci would necessitate retesting. Agent Minor testified that the number of matches in this case was sufficient to conclude that the DNA samples matched. He testified that in this case, "the thirteenth locus was inclusive" and that it was "actually a callable allele, but [TBI] policy doesn't allow [analysts] to call those loci unless they're complete. So taking the twelve loci approach is definitely a more conservative way to report this." Agent Minor also testified that it is the TBI's practice to maintain samples to make available for independent analysis.

*Analysis*

On appeal, Defendant challenges the sufficiency of the convicting evidence. Defendant does not assert that any of the elements of especially aggravated kidnapping or aggravated rape were not established. Defendant's only contention regarding the sufficiency of the evidence is that the DNA evidence is the only evidence of Defendant's identity as the perpetrator. Defendant also asserts that the trial court erred by limiting his cross-examination

-4-

of a State's witness and by denying Defendant the opportunity to make an offer of proof of his excluded cross-examination.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190–92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (Tenn. 1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.1982).

In *State v. Toomes*, this Court held that DNA evidence, without corroboration, was sufficient to support a conviction for aggravated rape. 191 S.W.3d 122, 130-31 (Tenn. Crim. App. 2005). Relying on the Tennessee Supreme Court's reasoning in *Jamison v. State*, 209 Tenn. 426, 354 S.W.2d 252 (1962), in which the supreme court concluded that corroborating

evidence was not required in a circumstantial evidence case based on fingerprint identification, the court in *Toomes* stated:

> From *Jamison*, we distill two important considerations. First, fingerprint identification evidence is unquestionably reliable, although we hesitate to characterize it as absolutely infallible. Second, the accessibility of a defendant to the examined object is highly relevant because it could suggest an innocent reason for a defendant's fingerprints to be on an object.

> In this instant case, we cannot conceive of an innocent reason for the defendant's DNA to be found on swabs taken from the victim's anal area. Therefore, in our opinion, accessibility is not an important consideration regarding the sufficiency of the evidence based on DNA analysis. In terms of the reliability of DNA analysis, we again hesitate to describe it as absolute or infallible, nor do we believe that any properly qualified expert in the field of DNA analysis would represent it in such a fashion. Nevertheless, DNA analysis represents a scientific breakthrough of unquestionable integrity, as recognized by Code section 24–7–117(b) [T.C.A. § 24-7-117(b)(1) (2006)], which authorizes the admission of DNA evidence "without antecedent expert testimony that DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material." Tenn. Code Ann. § 24–7–117(b) (1994) [T.C.A. § 24-7-117(b)(1) (2006)].

> . . . .

> By our holding, we are not announcing an iron-clad principal that DNA evidence, without corroboration, is always sufficient to support a conviction. Practically infinite factual variations can arise, and we do not intend by our opinion to prejudge other factual scenarios.

*Toomes*, 191 S.W.2d at 131.

In the case *sub judice*, neither victim was able to identify Defendant as the perpetrator because both victims were bound and their eyes were covered with duct tape. At trial, however, the daughter testified that Defendant's physical appearance matched her recollection of her attacker. Agent Howard testified that Defendant's DNA matched DNA taken from sperm taken from the swab of the daughter's labia. The TBI Crime Lab report states that "[t]he probability of an unrelated individual having the same DNA profile from either the African-American, Caucasian, Southeastern Hispanic, or Southwestern Hispanic

populations exceeds the current world population." Defendant's DNA expert testified only that errors are possible in DNA analysis. Dr. Acton did not testify that any errors were made in Agent Howard's analysis. The jury credited Agent Howard's and Agent Minor's testimony. We conclude that the evidence in this case is sufficient to establish Defendant's identity as the perpetrator of both crimes. Defendant is not entitled to relief on this issue.

For his second issue, Defendant asserts that the trial court erred by "sua sponte cutting off the cross-examination of the State's DNA expert and thereafter denying [Defendant] the opportunity to make an offer of proof." The issue involves the following exchange during defense counsel's cross-examination of Agent Howard:

| [Defense counsel]: | And did you receive a request from defense counsel . . . asking that Dr. Roy Acton be permitted to review the materials in this case? |
| --- | --- |
| [Agent Howard]: | Yes. |
| [Defense counsel]: | And you did not agree to that request; did you? |
| [Agent Howard]: | That's correct. |
| THE COURT: | Just a minute now . . . . The Court has ruled on that matter. The Court ruled that [defense counsel was] not entitled to that matter. That is an improper question, sir. Disregard that. |
| [Defense counsel]: | Those are my questions, Your Honor. |
| THE COURT: | Redirect. |
| GENERAL MOORE: | No other questions, Your Honor. |
| THE COURT: | Ms. Howard, you are excused. Thank you very much. Next witness? |
| GENERAL MOORE: | Your Honor, at this time, the State would rest its case in chief. |
| THE COURT: | Ladies and Gentlemen, that is the State's case in chief. I know we've just come back, but |

| | |
|---|---|
| | there will be some legal questions I'll have now. So I'm going to ask you to step out again. I'll get you back as quick as I can. |

(WHEREUPON, the Jury left open court at 10:13 a.m. and the following proceedings were had:)

| | |
|---|---|
| THE COURT: | All right. That's the State's proof. Anything from the defense before we start the defendant's proof? |
| [Defense counsel]: | May it please the Court, with regard to Your Honor's sua sponte ruling in response to my question, I need to state for the record that the request to Ms. Howard preceded the issuance of the subpoena and – |
| THE COURT: | I don't care. I ruled that that is not a proper way to obtain evidence. And I ruled that you're not entitled to that evidence. And the Court ruled on that before we started this case. |

From the trial court's last statement in the above quote, it appears that the court had previously made a ruling in a pretrial hearing regarding the matter which was the subject of Defendant's question on cross-examination. However, there is no transcript of any such hearing in the appellate record.

The issue was addressed at the hearing on Defendant's motion for new trial. Defendant argued that it was error for the trial court to quash "a subpoena duces tecum for the State's TBI agent." Defendant asserted, "We were seeking materials for review of the defense DNA expert. DNA was a critical issue in this trial, because it was the only . . . proof of identity that we had here." Defendant further asserted that the trial court "on its own initiative, in the absence of any objection from the State, interrupted [defense counsel's] cross-examination of Agent Howard when [defense counsel] asked if she had refused a request from the defense expert to view the materials that [the defense] had unsuccessfully sought by subpoena."

The State responded that it was a "discovery issue" and that Defendant had requested "an enormous amount of material . . . at the 11th hour." The State argued that the trial court

-8-

was correct in limiting Defendant's questioning of Agent Howard regarding a "refusal" because the State had not refused any materials relied upon by Agent Howard, but rather provided an "open file discovery policy" to Defendant. At trial, Dr. Acton, Defendant's expert witness, testified that he first became involved in this case on March 16, 2010, less than two weeks prior to trial.

We disagree with Defendant's characterization that his cross-examination of Agent Howard was "cut off" or that he was denied the opportunity to make an offer of proof. In fact, our reading of the above exchange shows that the trial court interrupted the cross-examination and stated that the question was "improper" and directed the jury to "disregard" it. However, there is nothing to suggest that Defendant was prevented from thereafter continuing his cross-examination. Therefore, we conclude that Defendant was not denied his Sixth Amendment right to confrontation as he asserts in his brief.

The transcript also shows that following the close of the State's proof, defense counsel began to explain to the court that "the request to Ms. Howard preceded the issuance of the subpoena . . . ," when the trial court interrupted him again and stated that the issue had previously been ruled on. However, defense counsel did not ask the court for permission to make an offer of proof. Without an offer of proof, we cannot speculate as to what Agent Howard meant when she testified that she did not agree to Defendant's request to review materials. Without anything further than the above exchange, we cannot conclude that the trial court erred. We must, therefore, presume that the trial court was correct. Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE