IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 7, 2017

## STATE OF TENNESSEE v. DEANDREY PETERSON

**Appeal from the Criminal Court for Shelby County**
No. 14-04005     Paula Skahan, Judge

_____

### No. W2017-00308-CCA-R3-CD

_____

The defendant, Deandrey Peterson, appeals his Shelby County Criminal Court jury convictions of aggravated rape, aggravated robbery, aggravated burglary, and possessing a firearm with the intent to go armed during the commission of a dangerous felony, claiming that the trial court erred by admitting certain evidence and that the evidence was insufficient to establish his identity as the perpetrator. Because the trial court erred by admitting evidence that the defendant had committed crimes other than those for which he was on trial and because the error cannot be classified as harmless, we reverse the defendant's convictions and remand the case for a new trial.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Reversed and Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Robert Brooks, (on appeal); Charles Gilchrist, Jr., (at sentencing), Memphis, Tennessee, and Deandrey Peterson, appellant, pro se (at trial).

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Shelton and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Shelby County Grand Jury charged the defendant with the February 12, 2014 aggravated rape and robbery of the victim, T.M., as well as the aggravated burglary of her apartment and possessing a firearm with the intent to go armed during the commission of a dangerous felony.[1]

_____

[1] To protect the anonymity of the victim, we utilize her initials.

At the defendant's November 2016 trial, T.M. testified that at approximately 12:00 p.m. on February 12, 2014, she was resting in her bedroom in the apartment she shared with a roommate when she heard footsteps in the kitchen. Because her roommate was at work, the victim became concerned, so she dressed quickly and went to investigate the source of the footsteps. She encountered a man dressed in black jeans, an orange t-shirt, plaid jacket, and baseball cap walking from the kitchen toward her bedroom. The man wore gloves and had "a white handkerchief scarf . . . up to his nose." The man pointed a black and gray gun in her face and said "don't scream."

The man walked the victim to her bedroom, forced her onto the bed, and removed her boots and clothing. He blindfolded the victim with a blue dress he took from her bed. The man then left the victim's bedroom and "started roaming around" the apartment "looking through stuff." The victim said that she could hear the man rifling around in her roommate's room and pouring change from a bottle into a bag. T.M. identified a large, empty bottle that had previously been filled with loose change.

When the man reentered the victim's room a short time later, he rubbed his penis against her body and asked her "to jack him off." She recalled that the man spoke to her very gently and that "he wasn't mean or nothing." The victim said that she did not scream or try to resist the man because she was scared. The man placed her hand on his penis, and she rubbed it. The man asked if he could perform cunnilingus on her but did not do so. She related what happened next: "[H]e told me that he was going to f*** the s*** out of me and laid me on the bed and then he put a rubber on." The man penetrated her vagina with his penis. She said that after the man raped her, "he went to the restroom and flushed the condom down the toilet."

When the man returned to her room after going into the bathroom, the man emptied the victim's purse onto the bed and took approximately $45 from it. The defendant demanded "the money . . . and stuff" and told her that he would kill her if she telephoned the police. He then got the victim's cellular telephone and asked for the security code. After she provided it, "he went through" her telephone "looking for pictures" of the victim naked. She said that she asked the defendant if she could telephone her sister who was due to arrive any minute to take the victim to a job interview. The victim said that she was scared for her sister, who was eight months pregnant at the time. The man allowed her to make the call. She said that he got behind the victim and lifted the blindfold just enough for her to dial the number. He also demanded that she put the call on speakerphone. When her sister didn't answer, the man replaced the blindfold, took the telephone, and continued "looking for stuff in the apartment."

-2-

As the man prepared to leave, he told the victim that if she reported the rape "he was going to shoot the s\*\*\* out of" her. She said that the man's calm, gentle demeanor was menacing. He told her to remain on the bed until "five to ten minutes" after hearing the door shut. She then heard the door open and shut but did not get off the bed. The defendant, who had not left the apartment, repeated that she was to stay on the bed. Shortly thereafter, she heard the door open and close a second time. The defendant again repeated his warning that the victim should remain on the bed. She recalled that he did this "four or five times" before finally leaving for good.

After the man left, the victim telephoned her sister, T.C., and waited on her to arrive.[2] T.C. took the victim to the tire shop where her roommate worked, and the victim called the police from there. After the police arrived, they took the victim back to the apartment. The victim said that she did not telephone the police from her apartment because she believed the defendant's warnings. The victim provided the police with a description of the perpetrator, and she viewed a photographic array but was unable to identify any of the men in the array as the man who had raped her.

Shortly after the offenses, the victim began receiving telephone calls from telephone number 901-649-1200. She did not answer the calls because she did not recognize this number.

On April 11, 2014, the victim viewed a second photographic array. This time she asked the officer showing the array to place a sheet of paper over the bottom half of each photograph to approximate the handkerchief that had covered the bottom portion of the perpetrator's face. She identified the defendant as the perpetrator. The victim said that she was "very sure" that the defendant was the man who had raped and robbed her. The victim identified a photograph of a gun as the gun that the defendant had held to her face during their encounter.

During cross-examination, the victim testified that the defendant remained in her apartment "[a] couple of hours."

On redirect examination, the victim testified that, after hearing the defendant, who was representing himself, speak, she recognized his voice as that of the man who raped her.

T.C. testified that on February 12, 2014, the victim asked T.C. to drive her to a job interview later that day. The victim later called T.C. back and asked how long it would be before she arrived. T.C. recalled that the victim's voice was cracking, so T.C.

---

[2]    We utilize initials in this instance to protect the anonymity of the victim.

asked if everything was okay. The victim did not say anything and "just hung up the phone." When T.C. arrived at the victim's house, the victim "ran out [of] the house and got in the car and told [T.C.] to hurry up and pull off." T.C. said that the victim's "face was red" and that "[s]he was crying and she was yelling." The victim told T.C. "that she had just got raped" and that the perpetrator had told her "if she called the police that he was going to come back and kill her." T.C. drove the victim to the tire shop where her roommate worked so that the victim could call the police.

Memphis Police Department ("MPD ") Officer Jerome Johnson responded to the victim's 9-1-1 call and "met with the victim at the intersection" near a tire shop in his patrol area. The victim told him that she had been raped by a black man, and she provided a detailed description of her assailant. "She said that he was a male/black, medium to dark complexion, he had on white bandana covering his face, orange T-shirt, plaid jacket of burgundy and gray color, faded black jeans. And he had [a] black fitted ball cap on his head." The victim told Officer Johnson that the perpetrator "was armed with a black handgun." The account of events that the victim provided to Officer Johnson mirrored her testimony at trial. Officer Johnson recalled that the victim was visibly distressed and frightened while providing her statement. After speaking to the victim, Officer Johnson secured the apartment. As he did so, he "noticed an unlocked window next to the back door."

Lieutenant Margaret Houston of the MPD acted as the lead investigator assigned to the victim's case. Lieutenant Houston created the first photographic array using the photograph of a man she had learned was a potential suspect. The victim was unable to make an identification from this array. Later, Lieutenant Houston developed another suspect and prepared a second photographic array. As she was viewing the second array, the victim told Lieutenant Houston "that since the bottom part of his face was covered that it was difficult for her." At that point, Lieutenant Houston "took Post-It notes and covered up the part of the face that she told me was covered." "Right away," the victim made an identification.

Rape Crisis Center nurse examiner Glenda Moses performed a forensic examination of the victim. The victim said that she had been penetrated vaginally by "a black male with a bandana on his face" who wore a condom during the assault. The victim "complained of some vulvar discomfort . . . and some vaginal irritation." Ms. Moses did not observe any injuries to the victim's genital area.

Tennessee Bureau of Investigation Special Agent Donna Nelson conducted forensic testing on the items in the sexual assault kit collected from the victim. She did not find any DNA belonging to the defendant.

E.S. testified that on March 27, 2014, she was sexually assaulted inside her apartment, which was located in the same apartment complex as the victim.[3] On that day, she was awakened by her dog's barking. When she got up to investigate, E.S. "noticed a man standing there fully all black." The man, whom E.S. later identified as the defendant, pointed a gun at her and demanded drugs and money. When she "told him [she] didn't know anything about any money or weed," the defendant told her to go into her bedroom, where her daughter lay sleeping. When they got into the bedroom, the defendant told them "to pull the sheets over" their eyes. As E.S. and her daughter lay in the bed with their faces covered, they heard the defendant "ransacking through [the] apartment for about ten minutes."

The defendant then returned to the bedroom and forced E.S. to go into the living room with him. He told her to "make sure that [her] daughter kept quiet or he would hurt her." When they got into the living room, the defendant "began to touch [E.S.] in a sexual manner." He asked E.S. to perform oral sex on him and, when she declined, he offered to perform oral sex on her. When she again declined, he told her to remove her pants, and he tied the pants around her eyes. The defendant performed oral sex on E.S. She described what happened next: "Then he took the pants off my eyes and then he pulled out a condom and he raped me in the living room." Throughout the assault, the defendant kept his face covered with "a black and gold Chanel scarf." E.S. recognized the scarf as one that had been missing from her apartment for approximately one month. E.S. said that she recognized the man's voice but could not initially recall where she had heard it. She recalled that the assault lasted more than two hours.

While he was in the apartment, the defendant went through E.S.'s cellular telephone looking at pictures. He asked her if she had any nude pictures on her telephone, and she said no. She said that "after the rape happened, he became sensitive. Almost a romantic type thing." The man warned E.S. not to contact police, telling her that "he had a police radio app on his phone that he could hear whenever someone calls the police" and that if he heard that she had called the police "he would come back and kill [her] and [her] daughter." The man took $200, an iPad, the Chanel scarf, and her cellular telephone. Following the assault, E.S. telephoned her mother before driving to a nearby store, where she flagged down a policeman.

C.O., who had previously lived in the apartment above the victim's, testified that on February 9, 2014, she "heard a big noise" and called out for her roommate.[4] When she heard no answer, she walked out of her bedroom and encountered

---

[3] Because E.S. was the victim of sexual assault, we refer to her by her initials.

[4] Again, because C.O. was a victim of sexual assault, we refer to her by her initials.

-5-

a man wearing a ski mask and holding a gun. The man, whom C.O. later identified as the defendant, demanded money, and when she told him she didn't have any, he "charged at" her and tried to take her clothes off. The man shoved her onto her bed and grabbed her neck so that she "could not breathe." She stopped struggling, and the man pulled her shorts and underwear down. He stopped trying to remove her clothes when he "saw the panty liner." At that point, the defendant put the condom he had been holding back in his pocket, and C.O. covered herself with a blanket. When the defendant left the bedroom, C.O. tried to escape through the back door, but it was locked. The defendant saw her and dragged her back to the bedroom. He pointed the gun at her, and she fell to the floor and "begged him not to harm" her. The defendant took her cellular telephone and asked her for the pass code. The defendant scrolled through the pictures on her phone. She said that the telephone contained some "intimate pictures, personal pictures, but no naked" photographs. The defendant paid particular attention to the intimate photographs. He took her cellular telephone with him when he left.

MPD Officer Willie Mathena testified that on March 27, 2014, he assisted other officers in "looking for a[n] SUV that was possibly responsible that was leaving the Abington Apartments area shortly after a criminal assault rape had occurred." Officer Mathena said that he was also looking for C.O.'s cellular telephone, which the police thought might be connected to the suspicious SUV. For that reason, Officer Mathena had asked C.O. to leave her cellular telephone activated so that he could trace the assailant using the number. At some point, Officer Mathena and his team observed an SUV matching the description they had been provided. They looked into the window of the parked vehicle and saw a cellular telephone. Officer Mathena dialed the number for C.O.'s cellular telephone, and the cellular telephone inside the SUV "[l]it up, rung and vibrated." Officers did not attempt to enter the vehicle but instead waited nearby and kept the vehicle under surveillance. A short time later, Officer Mathena saw the defendant approach the SUV with keys in his hand. Before the defendant could touch the vehicle, officers "tackled him to the ground. His hat fell off and the keys in his hand also fell on the ground."

During cross-examination, Officer Mathena said that the defendant's ex-girlfriend told the police that the defendant had telephoned her from C.O.'s cellular telephone number on March 23, 2014.

MPD Officer Christopher Vaden testified that on March 27, 2014, he and other officers searched the apartment where the defendant was purportedly staying with his girlfriend after receiving consent to search the apartment from the defendant's girlfriend, who was the lessee. Upon entering the apartment, Officer Vaden immediately observed a black and gold Chanel scarf that matched the description of the scarf taken

from E.S. Officers found "a silver and black Rug[]er .40 caliber" handgun "in the rear bedroom in a nightstand beside the bed."

The defendant testified that he did not rape the victim and that, prior to coming to court for the first time on the charges in this case, he had never even seen her before.

During cross-examination, the defendant admitted that he had been driving the SUV and had been using the telephone that was stolen from C.O. The defendant claimed that the black and gold Chanel scarf officers seized from his girlfriend's apartment had been given to him "over a year" before by a cousin who purchased it in Houston, Texas. He claimed that he bought the cellular telephone from a homeless man at the Beaumont Car Wash. The defendant said that he had no idea where the homeless man had gotten the cellular telephone or what had been done with it before he purchased it for $20. He said that the only reason he had been charged with these offenses was "because of a phone." The defendant said in addition to the cellular telephone, he had also purchased "[a]ll kind of jewelry" "off the street from random people" that he then pawned for cash. He identified a photograph of a bracelet and necklace that he described as two of such items. He also identified a photograph of a ring that he purchased from a random street person and that his "baby mama" pawned for him.

The defendant insisted that T.M., E.S., and C.O. had only identified him as the perpetrator of the crimes because the identification procedure was suggestive. He claimed that, of the women, he knew only E.S., to whom he had previously sold marijuana. When asked how E.S.'s DNA came to be found on his pubic bone, the defendant said that the prosecutor's office "probably tampered with it."

C.O. testified in rebuttal that the gold necklace, bracelet, and ring pawned by the defendant on February 20, 2014, had been taken from her apartment on the day the defendant tried to rape her.

Based upon this evidence, the jury convicted the defendant as charged. Following a sentencing hearing, the trial court imposed a sentence of 20 years for the defendant's conviction of aggravated rape, to be served at 100 percent by operation of law; a sentence of 10 years for the defendant's conviction of aggravated robbery, to be served at 85 percent by operation of law; a sentence of six years for the defendant's conviction of aggravated burglary, to be served at 30 percent; and a sentence of four years for the defendant's conviction of possession of a firearm with intent to go armed during the commission of a dangerous felony, to be served at 100 percent by operation of law. The court ordered the defendant to serve the 10-year sentence for his aggravated robbery conviction consecutively to the 20-year sentence for his aggravated rape

conviction. The court ordered the defendant to serve the four-year sentence for the firearm offense to be served consecutively to the six-year aggravated burglary sentence, as required by law, but concurrently with the remaining sentences. The total effective sentence is, therefore, 30 years.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant challenges the sufficiency of the convicting evidence and the trial court's ruling allowing the testimony of E.S. and C.O.

*I. Sufficiency*

The defendant asserts that the evidence was insufficient to support his convictions because the State failed to establish beyond a reasonable doubt his identity as the perpetrator. The State contends that the evidence was sufficient.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

The defendant does not allege that the State failed to establish the elements of any of the conviction offenses and instead argues that the victim's identification of him as the perpetrator was insufficient given her testimony that she was only able to see the perpetrator's eyes.

Here, the victim testified that she observed the perpetrator's eyes during the encounter. When shown the first photographic array, the victim was unable to make a

positive identification. When shown an array that contained the defendant's photograph, however, the victim was able to positively identify the defendant as the perpetrator by using paper to cover the bottom portion of the photographs. "[T]he question of identification of a defendant as the person who committed the offense is a question for the jury, and a victim's identification alone is sufficient to support a conviction." *State v. Toomes*, 191 S.W.3d 122, 130 (Tenn. Crim. App. 2005) (citing *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)). In addition to the victim's identification of the defendant, the evidence established that following the assault, she received calls from an unknown number. When he was arrested, the defendant had in his possession a cellular telephone with that telephone number. Viewing the evidence, as we must, in the light most favorable to the State, we conclude that the evidence was sufficient to support each of the defendant's convictions.

## II. Tennessee Rule of Evidence 404(b)

The defendant asserts that the trial court erred by allowing E.S. and C.O. to testify, arguing that their testimony violated Tennessee Rule of Evidence 404(b). The State asserts that the trial court did not err because the evidence was admissible to establish the defendant's identity as the perpetrator, a permissible purpose under Rule 404(b).

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury's convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than upon the strength of the evidence. *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005). This rule is subject to certain exceptions, however, including "evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same." Tenn. R. Evid. 404(a)(1). In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. The rule specifies three prerequisites to admission:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court must find by clear and convincing evidence that the defendant committed the other crime or bad act. *Id.*, Advisory Comm'n Comments; *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997); , 694 S.W.2d 299, 303 (Tenn. 1985).

When the trial court substantially complies with the procedural requirements of Rule 404(b), this court will overturn the trial court's ruling only when there has been an abuse of discretion. *See Thacker,* 164 S.W.3d at 240; *see also DuBose*, 953 S.W.2d at 652. If, however, the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *See id.*

In this case, the trial court complied with the procedural requirements of Rule 404(b). Following a lengthy jury-out hearing at which both E.S. and C.O. testified, the trial court found that the State had established the other bad acts by clear and convincing evidence and that a material issue existed as to the identity of the perpetrator. The court concluded that the "[v]ery similar, distinctive pattern" of the offenses committed against all three women was probative of the defendant's identity as the assailant in the victim's case. Discussing the similarities between the attack on the victim and the attack on E.S., the trial court observed:

> Same apartment complex. She hears her dog barking, goes to the kitchen, there is a man with dark clothing with a gun asking where the weed is, where the money is, takes her back to her bedroom, tells her and her daughter to cover up in the bed; ransacks the apartment.
>
> Tells her . . . keep her daughter in the bedroom and tells her to come in the living room. He begins touching her in a sexual way. He takes her pants off her, ask[s] if he can perform oral sex on her, blindfolds her with her pants. Had sex with her, rapes her.
>
> Flushes his condom down the . . . toilet in the bathroom.
>
> Very similar, distinctive pattern as in that occurred in the testimony in this case. Talks to her softly. Tells her if

-10-

she calls the police he'll come back and kill her and her daughter.

When comparing the attack on C.O. with the attack on the victim, the trial court noted:

> . . . . [T]his is again a signature . . . that appears to be very, very similar to the facts in the case on trial here. Three days apart. Same apartment complex. Apartment right above where [the victim] lived. Covering the face, how it's exposed, gun pointed, looks very similar, cell phone number matches the one that was used to call [the victim] even though she did not answer.

The court concluded that "the probative value regarding identification is not outweighed by the danger of unfair prejudice."

In our view, the record does not support the ruling of the trial court. Although we agree with the trial court's conclusions that identity was a material issue at trial and that the State established the other crimes by clear and convincing evidence, we cannot agree that the offenses committed against E.S. and C.O. were sufficiently similar to the offenses at issue in the defendant's trial as to qualify for admission under evidence Rule 404(b).

When the State offers proof that the defendant committed crimes other than the one on trial as evidence of the defendant's identity as the perpetrator, "the modus operandi of the other crime and of the crime on trial must be substantially identical and must be so unique that proof that the defendant committed the other offense fairly tends to establish that he also committed the offense with which he is charged." *Bunch v. State*, 605 S.W.2d 227, 230 (Tenn. 1980).

> [M]ere similarity in the manner in which two crimes are committed does not produce the relevance necessary for admission—uniqueness does. For not only must the offenses have been committed similarly, but they must also have been committed in a unique and distinctive manner. Obviously, the more unique and distinctive the methods, the more appropriate is the inference. The converse also obtains: that is, the less unique and distinctive the methods, the less appropriate the inference.

*State v. Roberson*, 846 S.W.2d at 280 (Tenn. Crim. App. 1992). "Although offenses may

-11-

be similar in many respects, 'they cannot be classified as signature crimes if they lack a distinct modus operandi.'" *State v. Toliver*, 117 S.W.3d 216, 229 (Tenn. 2003) (quoting *State v. Shirley*, 6 S.W.3d 243, 248 (Tenn. 1999)). To be admissible, "the offenses need not be identical in every respect," *Shirley*, 6 S.W.3d at 248 (citing *Bunch*, 605 S.W.2d at 231), but "the methods used in committing the offenses must have 'such unusual particularities that reasonable men can conclude that it would not likely be employed by different persons,'" *Shirley*, 6 S.W.3d at 248 (quoting *Harris v. State*, 227 S.W.2d 8, 11 (Tenn. 1950)).

"The test . . . is not whether the evidence demonstrates that the defendant committed both crimes, but whether the defendant used a peculiar and distinctive method in committing the crimes." *State v. Jones*, 450 S.W.3d 866, 895 (Tenn. 2014) (citing *Young v. State*, 566 S.W.2d 895, 897 (Tenn. Crim. App. 1978)). "[T]he applicable standard focuses on the distinctiveness of the crimes, not a mere assessment of similarities or an existence of rarity." *Jones*, 450 S.W.3d at 897 (citing *Roberson*, 846 S.W.2d at 280).

When assessed under the appropriate standard, it is clear that although the methods used in the attacks on the victim, E.S., and C.O. are indeed quite similar, "none are so unique that they may be said to bear the stamp or imprimatur of the appellant." *Shirley*, 6 S.W.3d at 249. The three events occurred in the same apartment complex, involved the ransacking of each victim's apartment and a request for oral sex, involved the perpetrator's use of a condom to accomplish a vaginal rape, involved the perpetrator's speaking in a soft manner, and involved a threat to harm the victims should they call the police. The closest thing to a "signature" or imprimatur was the perpetrator's asking each of the three women whether they had nude pictures on their cellular telephones. This was not so unusual or distinct, however, "that reasonable people would conclude that the same person committed all of the offenses." *Shirley*, 6 S.W.3d at 249; *see also State v. Davis*, 706 S.W.2d 96, 100 (Tenn. Crim. App. 1985) ("There was nothing so unique about the method of commission of the two crimes as to stamp them as the work of the same individual.").

The differences in the three attacks support a conclusion that the evidence offered by the State was not admissible under Rule 404(b). Although the defendant covered his face during each attack, he did so using different means. He covered his face with a ski mask when attacking C.O., a Chanel scarf when attacking E.S., and a white handkerchief when attacking the victim. The defendant did not wear the same attire during any of the attacks. Both the victim and E.S. were blindfolded during the attack, but C.O. was not. The defendant asked the victim and E.S. if they would like him to perform oral sex on them, but he only performed oral sex on E.S. The defendant made no such request of C.O. The defendant forced the victim to rub his penis with her hand but

did not force either E.S. or C.O. to do so. Although the defendant threatened to kill the victim and E.S. if they contacted authorities, he showed only E.S. an app that he could purportedly use to track calls to the police. The attacks on C.O. and the victim occurred in close temporal and physical proximity, but the attack on E.S. occurred several weeks later. None of the attacks occurred during the same time of day.

Although the defendant examined each woman's cellular telephone for nude photographs, he stole only E.S.'s and C.O.'s telephones. He allowed the victim to keep hers. That the defendant later used the cellular telephone taken from C.O. to telephone the victim in this case does favor a finding that the evidence of the attack on C.O. was admissible under 404(b); however, it was the fact that the victim received a telephone call from a telephone that was found in the defendant's possession at the time of his arrest that suggests his identity as the perpetrator and not the fact that the telephone was taken by the defendant during the attack on C.O. The State could have offered evidence that the defendant telephoned the victim from the telephone found in his possession without any reference to the attack on C.O.

Given the differences between the offenses testified to by E.S. and C.O. and the charged offenses, we cannot say that the similarities between the attacks on the three women were sufficient "to establish a modus operandi that is comparable to a signature." *Jones*, 450 S.W.3d at 899. In consequence, the trial court erred by admitting the evidence of the attacks on E.S. and C.O. Moreover, although the trial court provided limiting instructions to the jury following the testimony of E.S. and C.O., the evidence related to the attacks on E.S. and C.O. was extensive. E.S., C.O., and Officer Mathena all offered testimony connecting the defendant to the attacks on E.S. and C.O. The prosecutor also questioned the defendant about the offenses during cross-examination, referencing more proof of the attacks on E.S. and C.O. than had been in the women's testimony. Indeed, the entirety of the State's rebuttal proof was offered to show that the defendant had taken and thereafter pawned jewelry belonging to C.O. Because the evidence establishing these two attacks was considerable and the evidence of the defendant's identity, while sufficient, was not overwhelming, we are constrained to conclude that the error was not harmless.[5]

---

[5] We note that this court recently reached a similar conclusion in another case involving the defendant, reversing convictions of aggravated rape, aggravated robbery, aggravated burglary, and possession of a firearm during the commission of a dangerous felony and remanding for a new trial on grounds that the trial court committed reversible error by allowing evidence of other rapes committed by the defendant. *See State v. Deandrey Peterson*, No. W2017-00307-CCA-R3-CD (Tenn. Crim. App., Jackson, Mar. 15, 2018). In that case, the victim and E.S. testified at the defendant's trial for raping a third woman, and this court concluded that the erroneous admission of their testimony entitled the defendant to a new trial. *See generally id.* In a third case involving the defendant, this court affirmed the defendant's convictions despite the admission of evidence of other rapes committed by the defendant "[b]ecause the trial court did not admit the evidence based upon signature crimes." *State v. Deandrey*

Accordingly, we reverse the defendant's convictions and remand the case for a new trial.

_____

JAMES CURWOOD WITT, JR., JUDGE

*Peterson*, No. W2017-01878-CCA-R3-CD, slip op. at 18 (Tenn. Crim. App., Jackson, Mar. 15, 2018).

-14-