IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 29, 2019, at Knoxville

## STATE OF TENNESSEE v. TIMOTHY LINDSEY

**Appeal from the Criminal Court for Shelby County**
No. 16-00466          Chris Craft, Judge

_____

## No. W2018-01987-CCA-R3-CD
_____

A Shelby County jury convicted the Defendant, Timothy Lindsey, of aggravated rape for a crime committed in 2005, and he was sentenced to serve thirty years in confinement. On appeal, the Defendant challenges the sufficiency of the convicting evidence and asserts that the ten-year delay in indicting him violated his right to due process. We conclude that the evidence is sufficient to support the verdict and that the Defendant has waived the issue of pre-indictment delay. Accordingly, the trial court's judgment is affirmed and the case remanded for correction of the judgment form.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed; Case Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Stephen Bush, District Public Defender, and Barry W. Kuhn, Assistant District Public Defender (on appeal), and Charles Waldman and Jake Brown (at trial), Memphis, Tennessee, for the appellant, Timothy Lindsey.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Abby Wallace, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The victim in this case was raped at gunpoint on March 31, 2005, after an intruder kicked down the door to her apartment. Law enforcement collected DNA evidence shortly after the offense, but the evidence was not subjected to testing until 2015, when a preliminary analysis implicated the Defendant. After further DNA testing, the Defendant was indicted for aggravated rape on January 28, 2016, and the case proceeded to trial.

At trial, the victim testified that in March 2005, she was living in an apartment attached to a bar where she was employed. She described the apartment as having a front room, which at the time contained a mattress and television, another room which she used as her bedroom, and a kitchen. She testified that her son and his girlfriend had recently moved out of the apartment.

Around 6:45 a.m. on March 31, 2005, a man kicked down her door as she slept in the front room. By the time she sat up, the man was holding a gun to her head. The victim stated that the apartment had no windows and that it was dark because the man did not turn on the lights. However, she was able to see well enough by the light creeping in through the open door to give a description of him. She described her attacker as an African American man, "clean cut," young, approximately five feet, seven inches tall, and weighing 130 to 140 pounds. She elaborated that the man's hair was short, but she did not recall if he had facial hair. She testified that she is five feet, four inches tall, and that he was taller and thinner than she was. The gun had a "long clip" in it, was not a handgun, and was eight to nine inches long. She testified that the gun may have been black, but she did not recall its color.

The man demanded to know "where the money was" and if anyone else was in the home. He forced her to take him around the apartment to demonstrate they were alone. He also ransacked the home in an effort to find money, looking through pillow cases and under the bed covers, lifting the mattress, and emptying a box of graham crackers.

The man took her back to the front room and demanded that she pull down her pants. Hoping to avoid rape, she lied to him and said she had AIDS. The man then demanded fellatio, and told her he would "blow [her] head off" if she bit him. The victim performed fellatio, and the man ejaculated in her mouth, causing her to gag. She testified that the semen went onto her t-shirt and the floor.

The man told her he would kill her if he saw police arriving, and he left. The victim waited a few minutes, then went into the café and called police. She gave a

statement to police at the scene, and they collected her t-shirt and a piece of the carpet. She was also taken to the Rape Crisis Center, where medical personnel swabbed her mouth. The victim identified photographs of the scene, including a photograph of two shoeprints on the front door. She testified the shoe prints had not been there the night before the attack. The victim gave another statement at the police station. She left the apartment that day and never stayed there again.

The victim was not contacted by police regarding the crime for the following ten years. At that time, Detective Howard Carter showed her a photographic lineup. She testified that Detective Carter said she should be one hundred percent sure before making an identification. On the photographic lineup, she put a red circle around the photograph of a subject who was not the Defendant. The victim testified she circled the photograph "[b]ecause I thought that was him, but it had happened so long ago, that I wasn't for sure. So I told [Detective Carter] that I couldn't say for sure that that was the person." The victim testified that she then wrote at the bottom of the form, "I can't pick out the person because it was dark."

The victim acknowledged that she had told police the assailant had no facial hair but that all the subjects in the lineup had facial hair. She acknowledged she described the intruder alternately as five feet, seven inches tall; five feet, nine inches tall; and five feet, ten inches tall. She agreed she had described him as having a medium complexion and weighing 135, 140, and 150 pounds. She explained that she estimated the height and weight of the intruder based on the physique her boyfriend at the time. The victim also testified she believed the gun was black with one handle, but after consulting her statement, she agreed she had told police that the gun was silver and had two handles. The victim agreed that the assailant stated several times that his mother had died that morning. The parties stipulated at trial that the Defendant's mother was still alive.

Ms. Elizabeth Thomas, a retired nurse, testified that she examined the victim at the Rape Crisis Center. The victim was tense and emotional and recounted the events consistently with her trial testimony. Ms. Thomas found no injuries, which she testified would not be uncommon. She took oral swabs from the victim, and she identified at trial the sealed packaging of the oral swabs she had collected in a "rape kit" and given to law enforcement. She noted that the outside of the kit indicated all the areas where swabs were collected and that in this case, she collected evidence only from the victim's mouth.

Officer Jeremy Quinn, who was retired from the Memphis Police Department at the time of trial, testified that he responded to the victim's call and that she stated she had been orally raped. She described her attacker as an African American man who was 140 to 150 pounds, eighteen to twenty-five years old, and five feet, nine or ten inches tall, with a medium complexion. The victim described a "mach-ten" type of weapon.

Officer Stacy Milligan, who was likewise retired from the Memphis Police Department at the time of trial, documented the crime scene. He stated that the door had been kicked twice with a left shoe. He measured the footprint and stated that the approximate shoe size was size eleven and a half. He clarified that the measurement was approximate and that the shoe could have been a size eleven or twelve. The doorjamb of the victim's apartment was broken where the door had been kicked in. Officer Milligan attempted to recover fingerprints from the graham cracker box but was unsuccessful. He collected the victim's black t-shirt but did not recall collecting a carpet sample.

Lieutenant Edward Luellen, also retired from the Memphis Police Department at the time of trial, took a statement from the victim at the scene and later at the police station. The victim had described the gun as long, silver, and automatic or semi-automatic. She stated her assailant was five feet, nine inches tall and weighed 130 to 150 pounds. The attacker had a medium complexion, short hair, no facial hair, and was "neat." According to the victim, the suspect stated that his mother had died that morning. Lieutenant Luellen did not send the swabs or t-shirt for DNA testing, testifying that he did not "think that technology was available at that time."

In 2015, Detective Howard Carter was investigating backlogged rape kits for the Memphis Police Department. Detective Carter was assigned to investigate the victim's rape in 2015, and he sent the swabs collected from the victim for testing. Through the testing, he obtained a suspect from a DNA profile database. He then interviewed the victim to see if she wanted to prosecute the case. The victim was very emotional and adamant that she would like to pursue the case, so Detective Carter created a photographic lineup using a picture of the Defendant taken close to the time of the crime. Because the Defendant's picture had facial hair, Detective Carter used other photographs with facial hair in the lineup. Before viewing the lineup, the victim was advised not to identify a suspect unless she was positive of her identification. Detective Carter stated that the victim began to circle a photograph and then began crying. The victim told Detective Carter, "I can't pick anybody out on this photo lineup, but I do know that I did not have consensual sex with anybody in this lineup." The photograph circled by the victim did not depict the Defendant. Detective Carter did not tell her which photograph to pick, but he agreed that he knew the person she circled was not the person whose DNA matched the physical evidence. He stated that after circling the photograph, the victim told him that she could not make an identification because it had been dark and that he merely instructed her to write down her own statement. He denied telling her what to write.

Detective Carter took a buccal swab from the Defendant to confirm the DNA match from the DNA database. He sent the swabs to Cellmark Forensics ("Cellmark"),

an independent DNA testing facility, for analysis. He did not send the t-shirt or carpet for testing.

Detective Carter acknowledged that the report related to this case contained entries from April and May 2014 which referenced receiving vaginal and vulvar swabs from Cellmark. He stated that he was not assigned to the case until September 2015, after the initial DNA testing had been completed. He agreed he signed the report but stated that the reference to vaginal or vulvar swabs in the report was a mistake.

The DNA testing implicating the Defendant took place in two phases, the first of which created profiles of the male DNA in the samples taken from the victim's mouth and the second of which compared the buccal swab from the Defendant to the previously identified profiles. Initially, Ms. Sarah Estes of Cellmark, an expert in forensic serology, examined the swabs taken by Ms. Thomas from the victim, in order to locate spermatozoa. She stated she received a sealed package which contained two envelopes, one labeled "oral swabs" and the other labeled "miscellaneous swabs." She testified that the kit indicated that it contained two oral swabs and two saliva standards, both taken by Ms. Thomas from the victim. However, she acknowledged she could not be certain where the miscellaneous swabs were taken. Ms. Estes took a small cutting from one swab and found forty spermatozoa. She agreed that it was not possible to distinguish spermatozoa from multiple donors under the microscope, that she could not establish the integrity of the sample prior to her receipt, and that she did not receive a t-shirt or carpet to test. She stated that degradation of DNA would not change the profile obtained but might result in the inability to obtain a full profile or any profile.

Ms. Taylor Templin, an expert in forensic DNA analysis who previously worked at Cellmark as a DNA analyst, conducted analysis on the DNA after Ms. Estes established that the sample contained spermatozoa. Ms. Templin testified that she extracted DNA from the swabs, purified it, measured it, amplified it by making copies, and then used an instrument to obtain data which she interpreted. She testified about the precautions taken to prevent and detect contamination. She stated that for both the oral and miscellaneous sets of swabs, she attempted to separate the epithelial DNA, which could come from skin cells or saliva, from the sperm cell DNA. She testified that such a separation is not always complete and that there is sometimes "carry-over," meaning that some non-sperm DNA will remain in the sperm fraction of the sample and vice versa.

Ms. Templin concluded that the sperm fraction of the DNA she obtained from the swabs labeled "oral" was a mixture of two individuals. She obtained a profile of the major contributor, who was a male. Because she was only able to identify one allele, or location on the DNA, from the minor contributor, she could not come to conclusions regarding the minor contributor to the sperm fraction of the oral swab. She obtained a

DNA profile from the epithelial fraction of the oral swab, and this profile belonged to a woman. From the swabs labeled miscellaneous, she obtained a profile from the epithelial fraction, and she concluded the same woman's DNA was present in the epithelial fraction of both sets of swabs. The male donor of the sperm fraction of the miscellaneous swabs could not be excluded as the male donor of the sperm fraction of the oral swabs.

Ms. Templin acknowledged that it was possible that the mixture in the sperm fraction of the DNA obtained from the oral swabs came from two male donors. She stated that this scenario was unlikely, that the minor contributor's allele was consistent with the female DNA profile, and that it was "highly likely" that the minor contributor was the victim because the sample was obtained from her mouth. She acknowledged that DNA degrades over time and that it was possible that the reason she was unable to construct a profile for the minor contributor was due to degradation.

After Detective Carter obtained the buccal swabs from the Defendant, they were submitted to Cellmark[1] for comparison with the sperm recovered from the victim's mouth. Ms. Stephanie Hickey, an expert in forensic DNA analysis, obtained DNA from the buccal swabs and analyzed it. She concluded that the male profile obtained from the sperm fraction of the oral swab and the male profile obtained from the sperm fraction of the miscellaneous swab were consistent with the Defendant's buccal swab. For each set of swabs, the probability of an unrelated individual matching the profile exceeded the world's population many times.

Ms. Hickey acknowledged that her salary depended in part on revenue gained from performing analysis for law enforcement. She clarified that she would get paid even if law enforcement did not get their preferred result. She also acknowledged that the accuracy of her results depended in part on the reliability of the prior testing performed by Ms. Templin. She agreed that her analysis could not determine whether or not a rape had occurred.

The defense presented the testimony of the Defendant's younger brother to establish that the victim's description of her assailant did not match the Defendant's appearance at the time. Mr. Jeremy Taylor testified that he was two years younger than the Defendant that that they grew up in the same household. They shared a room and also shared clothing and shoes. He testified that they both wore a size twelve shoe beginning in high school. Mr. Taylor also stated that the Defendant has always had facial hair and that the Defendant had facial hair in 2005. Mr. Taylor testified he was six feet, three inches tall, and he said he was taller than the Defendant "by just a little bit." The

---

[1] By this point, Cellmark Forensics had become Bode Cellmark.

Defendant had always been tall and reached his full height in high school. The Defendant was eighteen or nineteen years old and weighed approximately 190 to 200 pounds in 2005. To cast doubt on the Defendant's identity as the intruder, who used his left foot to kick in the door, Mr. Taylor testified that he and the Defendant were both right-handed. Mr. Taylor acknowledged that he had prior drug convictions and that the Defendant had always had short hair.

The jury convicted the Defendant of aggravated rape. The trial court determined the Defendant was a Range II offender based on two prior aggravated burglaries committed in around the time of the aggravated rape. After applying two enhancement factors, the trial court sentenced the Defendant to thirty years in prison.

## ANALYSIS

## I. Sufficiency of the Evidence

On appeal, the Defendant challenges the sufficiency of the evidence, arguing that the proof at trial was insufficient to establish his identity as the assailant. We conclude that a rational trier of fact could have found that the State established identity beyond a reasonable doubt.

This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from the evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts of evidence in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Smith*, 436 S.W.3d at 764. In reviewing the sufficiency of the evidence, we afford the State the strongest legitimate view of the evidence and all reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277. "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every

reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

Aggravated rape, as charged here, is the unlawful sexual penetration of the victim by the defendant when force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon. T.C.A. § 39-13-502(a)(1). Sexual penetration includes fellatio. T.C.A. § 39-13-501(7) (2005). Here, the victim testified that she was forced to perform fellatio at gunpoint.

The Defendant does not dispute that the State established the elements of an aggravated rape, but he disputes the sufficiency of the evidence regarding identity. Identity is an essential element of every crime. *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015). The identification of the perpetrator of a crime is a question of fact for the jury. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *Pope*, 427 S.W.3d at 369 (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)).

The Defendant points to the disparities between the victim's description of her assailant and his physical characteristics at the time of the offense. The victim described her assailant as between five feet, seven inches and five feet, ten inches tall and weighing between 130 and 150 pounds. She stated he had no facial hair. Although the Defendant's brother testified that in 2005, the Defendant was taller and heavier than the victim's description, that he had facial hair at the time, and that he was right-handed, other evidence, including the victim's description of her assailant as a young African American man with short hair, the size of the shoe prints on the door, and the DNA evidence, supports the conclusion that the Defendant was the offender. The testimony offered by the defense merely constituted a conflict in the evidence, which the jury was free to resolve in the State's favor. We will not revisit the jury's resolution of conflicting identity evidence presented at trial. *Pope*, 427 S.W.3d at 369.

The Defendant also asserts that the DNA proof was "inconclusive and unreliable." He notes that the sample was not tested for a number of years and might have degraded. However, Ms. Estes testified that degradation would result in an inability to get a full profile or perhaps any profile at all. She stated that degradation of DNA would not change the profile itself. While Ms. Templin testified that there was some possibility that degradation prevented her from obtaining a full profile of the minor contributor to the sperm fraction of the oral swab, she also testified that it was unlikely the minor contributor was another male and "highly likely" that the minor contributor was the victim. In any event, obtaining the profile of the minor contributor would not exculpate

the Defendant, whose DNA matched the sperm in both sets of swabs taken from the victim's mouth shortly after the rape.

The Defendant argues that Ms. Templin's testimony regarding the minor contributor to the oral swab and her testimony that the donor of the sperm fraction of the miscellaneous swab could "not be excluded" as the donor of the sperm fraction of the oral swab do not establish proof of identity beyond a reasonable doubt. However, the State's proof at trial was not solely composed of Ms. Templin's testimony. The victim testified that she was forced to perform fellatio at gunpoint and that the assailant's semen was present in her mouth and on her clothing. The victim gave a detailed account of the assault, and law enforcement found physical corroboration of an assault, including the ransacked apartment, the broken doorjamb, the footprint on the door, and the stains on the victim's shirt and carpet. The victim described the assailant as an African American man with a medium complexion and short hair who was between eighteen and twenty-five years old. The shoe print from the victim's front door was the same approximate size as the Defendant's shoe. Two sets of swabs were taken from the victim's mouth shortly after the assault.

Ms. Templin testified that she obtained a DNA profile from both sets of swabs. While the sperm fraction of the DNA from the swabs labeled "oral" was a mixture of two profiles, Ms. Templin testified that the minor contributor, whose genetic material was present only in a slight quantity at one allele and was consistent with the victim's DNA, was most probably the victim. She acknowledged that it was possible that the minor contributor was not the victim but a male. Ms. Templin stated that the donor of the DNA from the sperm fraction of the miscellaneous swab could not be excluded as the donor of the DNA from the sperm fraction of the oral swab. Subsequently, Ms. Hickey performed analysis of the buccal swabs obtained by Detective Carter from the Defendant. She compared the Defendant's known profile to the profiles from the oral and miscellaneous swabs. Ms. Hickey testified that the Defendant's DNA from the buccal swab matched the sperm fraction of the DNA obtained from both the oral and miscellaneous swabs. The probability of an unrelated individual matching the DNA exceeded the world's population many times. We conclude that a rational trier of fact could have found that the State established the Defendant's identity as the assailant. *See State v. Toomes*, 191 S.W.3d 122, 131 (Tenn. Crim. App. 2005) (upholding conviction when DNA evidence was the only evidence linking the defendant to the rape).

## II. Delay in Indictment

The Defendant next asserts that his due process rights were violated by the delay between the occurrence of the offense and the indictment. The State responds that the

issue is waived for failure to raise it prior to trial but that in any event, there was no due process violation. We agree that the issue is waived.

A delay between the commission of the offense and the commencement of adversarial proceedings may implicate a defendant's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and article I, sections 8 and 9 of the Tennessee Constitution. *State v. Gray*, 917 S.W.2d 668, 671, 673 (Tenn. 1996); *see also* T.C.A. § 40-2-101(b)(1) (the statute of limitations for a Class A felony is fifteen years). However, here, the Defendant never asserted prior to trial that his due process rights had been violated by the eleven-year delay between the commission of the crime and the indictment. Instead, the Defendant first raised this issue in his motion for a new trial.

Tennessee Rule of Criminal Procedure 12(b) requires motions alleging a defect in the institution of the prosecution to be filed prior to trial. Tenn. R. Crim. P. 12(b)(2)(A). Pre-indictment delay concerns a defect in the institution of prosecution. *See* Fed. R. Crim. P. 12(b)(3)(A)(ii) (listing pre-indictment delay as a defect in the institution of prosecution); *State v. Vickers*, 970 S.W.2d 444, 447 (Tenn. 1998) (noting that Tennessee Rule of Criminal Procedure 12 is the counterpart of the federal rule and turning to the federal rule for guidance). Failure to raise issues required to be raised prior to trial by Rule 12 results in waiver "[u]nless the court grants relief for good cause." Tenn. R. Crim. P. 12(f); *see State v. Mark Steven Marlowe*, No. E1998-00873-CCA-R3-CD, 2000 WL 872706, at *3 (Tenn. Crim. App. June 30, 2000). This court has previously concluded that failure to raise pre-indictment delay prior to trial constitutes waiver. In *State v. Phillips*, this court held that the defendant had waived his right to assert that the five-year delay between the commission of the crime and his arrest violated his due process rights because he did not raise the issue in a pretrial motion. 728 S.W.2d 21, 26 (Tenn. Crim. App. 1986); *see also State v. Jerrie Coleman*, No. W2015-01925-CCA-R3-CD, 2016 WL 7687124, at *7 (Tenn. Crim. App. June 15, 2016) (reviewing a claim regarding pre-indictment delay for plain error when the defendant failed to file a pretrial motion); *State v. John Adrian Day*, No. E2010-01108-CCA-R3-CD, 2012 WL 2926155, at *7 (Tenn. Crim. App. July 18, 2012) (concluding that the defendant's claims regarding pretrial delay under both the Fifth and Sixth Amendments were waived for failure to file a pretrial motion, particularly because without a hearing, there was no basis for the court to conduct a proper legal analysis of prejudice[2]).

---

[2] We note that the Defendant's argument that prejudice may be presumed pursuant to *Doggett v. United States*, 505 U.S. 647, 652 (1992), is not meritorious because *Doggett* concerned the Sixth Amendment right to a speedy trial. *See State v. Utley*, 956 S.W.2d 489, 495 (Tenn. 1997) ("Although *Doggett* may have relaxed the need for showing prejudice in relation to a sixth amendment speedy trial claim, it did not change the need to show actual prejudice in relation to a due process claim.").

The State asserted in its brief that the Defendant waived the issue, and the Defendant has not responded to the waiver argument.  We accordingly conclude that the issue is waived.

## CONCLUSION

Based on the foregoing analysis, we affirm the trial court's judgment.  The record contains a "Corrected" judgment sheet filed after the instant appeal which incorrectly indicates that the Defendant was sentenced as a standard offender.  It also does not indicate that the Defendant was tried by a jury.  Insofar as there are errors on the judgment form, the trial court is directed to correct them.  We remand for any necessary correction of the judgment form.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE