IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2024

**STATE OF TENNESSEE v. TONY STAFFORD**

**Appeal from the Criminal Court for Shelby County**
No. C1900250    Jennifer Fitzgerald, Judge
_____

**No. W2024-00637-CCA-R3-CD**
_____

Defendant, Tony Stafford, was convicted by a Shelby County jury of aggravated rape. The trial court sentenced Defendant as a Range I offender to twenty-five years. On appeal, Defendant claims that the State's pre-indictment delay constituted a due process violation and that the evidence was insufficient to support his conviction. Defendant filed a motion requesting waiver of his untimely notice of appeal; however, he failed to file a timely motion for new trial before the trial court. We elect to waive the untimely notice of appeal in the interest of justice. However, because Defendant's motion for new trial was not timely filed, we address only Defendant's challenge to the sufficiency of the evidence. Upon review of the record, legal authority, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Phyllis Aluko, Public Defender, and Harry E. Sayle, III (on appeal) and Constance J. Barnes (at trial), Assistant Public Defenders, for the appellant, Tony Stafford.

Jonathan Skrmetti, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Dru Carpenter and Gavin Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

In December 1988, A.G.D.,[1] the victim, left a bar with a group of people she knew and Defendant whom she did not know. When the group decided not to go to another establishment, Defendant dropped the others off and drove the victim to an empty lot where he raped her in the backseat of his car. Law enforcement collected DNA evidence after the offense, but the evidence was not tested until 2015. A preliminary analysis sometime thereafter implicated Defendant. Further DNA testing confirmed Defendant's identity as the suspect. In 2019, he was indicted for aggravated rape, and the case proceeded to trial on January 31, 2024.

At trial, the victim testified that she had just turned eighteen on December 1, 1988, and was about to start her last semester of high school. On the evening of December 18, 1988, the victim met several people from her after-school job for a Christmas party. She testified that she had "maybe . . half a glass of wine" but no more because she was underage. At some point in the evening, the victim and her coworkers went to a bar in Midtown, an area of Memphis she was not familiar with.

The victim and some of her coworkers decided to go to another bar. The victim got into a car with a woman named Ramona and two men, including a man she did not know. While in the car, the group changed their minds about going to another bar and asked to be dropped off at their respective homes. The unknown man, who was driving, dropped everyone off at their homes until the victim was the only passenger remaining in the car.

The victim recalled the man getting on the Expressway and driving around Midtown. The victim grew concerned and asked the man where he was taking her and he replied, "you'll see." She recalled that the man took the exit for Mississippi Boulevard and stopped the car in an empty lot or field. The man stepped out of the car, grabbed the victim, threw her in the backseat, and forcibly removed her pants and her underwear. When the victim screamed and cried, the man threatened to "slash [her] throat." The victim testified that she "just froze."

The man held the victim down by the neck and penetrated her vagina with his penis. The victim testified that she was a virgin, and the penetration was "very painful" and "really, really hurt." She recalled that the penetration "lasted a while." When he finished, the man stepped back into the driver's seat and drove out of the empty lot. The victim was

---

[1] We will follow this court's policy in sexual assault cases of referring to the victims and their relatives by their initials.

in the backseat bleeding, crying, and in pain. She put her clothes back on and was fearful that the man would kill her. The man returned to the bar from which they had originally departed, ordered the victim to get out, and threatened to slash her throat if she told anyone what he had done.

The victim testified that she had enough change to use a pay phone to call a friend who picked her up and took her to his apartment. He tried to calm her so she could call her sister and her family. The victim was crying and described her state as "a mess." After she washed her face, the victim called her sister who picked her up and alerted their parents.

The victim first went to St. Francis Hospital. Once there, she was instructed to go to the Rape Crisis Center where she underwent a forensic examination and a rape kit was collected. The victim found the examination to be "terribly [in]vasive" and very painful. She was bleeding, bruised, and in "terrible pain." The victim had never been to a gynecologist "before in [her] life." She stated, "maybe it was because it was [thirty] years ago, but they really weren't that caring or – you know, it was just a job to them."

As for the remainder of the examination, the victim recalled that she was given a pregnancy test, sent home "with a pamphlet," and her underwear was collected. She identified the form she signed to consent to a rape kit examination. The form, which was a checklist of items to be collected and tests to be performed, was introduced without objection. The form showed that no urine or blood samples were collected for a drug screen and that no photographs were taken. The victim denied writing "no photographs" on the rape kit consent form but agreed that she did initial the area. She added that it was the same situation regarding the drug test. Although the box for a drug screen was not marked, the victim testified that she would have consented to a drug screen. She surmised that the examiner may not have collected a sample for a drug screen because one was not needed. She testified that she was not intoxicated and had never used drugs.

After the forensic examination, the victim met with police. The victim did not hear from law enforcement until 2018, when she was notified that a man had been identified as a suspect. When asked if she wanted to press charges, she replied that she did because "if he's still out there doing this to girls, I want to be the one to stop him." The victim did not learn Defendant's name or identity until June 2023. The victim denied that she consented to have sex with Defendant, the man identified as the suspect.

On cross-examination, the victim was questioned about the statement she gave to law enforcement at the time of the incident in 1988. She testified that she spoke to several officers or detectives about the rape, but the officer who took down her statement "had an attitude" and "was ready to go home." According to the victim there were "maybe two sentences" about the rape in the statement. The victim explained that the officer failed to

include certain details or misstated what she had reported. Notably, there was no mention in the statement about the attacker having a knife or threatening to slash the victim's throat. The victim testified that she had more than "a little bruise" on her right shoulder as documented by the officer. The victim stated that the officer was "more concerned about if [she] was gay than being raped." None of the officers asked her whether the sex was consensual. The victim acknowledged that it was difficult for her to talk to the officers because she had not slept in twenty-four hours, but she maintained that the officer who took down her statement did little to accommodate her as he was the "least caring person you could talk to."

M.S., the victim's sister, testified that in December 1988, the victim called her while she was at work and told her she had been raped and needed M.S. to pick her up at her friend's house. The victim was crying and sounded "very upset." M.S. picked up the victim and drove her to their parents' home. She described the victim as "emotional, crying, [and] pitiful." M.S. testified that their parents took the victim to the hospital.

M.S. testified that before the rape, the victim was a "fun, loving, and happy" kid and that the victim had not been the same since the rape. The victim became reserved, kept to herself, and rarely socialized. She suffered from depression and was unable to take exams for her final semester and dropped out of school.

Patricia M. Speck testified that on December 19, 1988, she conducted a sexual assault examination on the victim and collected specimens for a rape kit. Ms. Speck acknowledged that she did not have an independent recollection of the victim's examination and reviewed the victim's records in preparation for her testimony. Ms. Speck was employed in the Memphis Shelby County Health Department as a family nurse practitioner in the Rape Crisis Center from 1984 to 2005 during which time she examined 300 to 600 patients for rape kit collections. Without objection, she was tendered as an expert in sexual assault nurse examination and forensic nursing. Ms. Speck identified her handwriting and signature on the victim's medical examination report and the patient medical evaluation form and checklist and the documents were admitted as a collective exhibit without objection.

During Ms. Speck's examination of the victim, the victim reported that an "unknown [black man]" threatened to "slash [her] throat" and "forced vaginal sex with ejaculation." The victim reported further that no condom was used and that she had not had intercourse before the incident. Ms. Speck testified about the victim's injuries, noting an abrasion in the medial labia majora. She explained that the abrasion was "the equivalent of a burn" and would be very painful given its location.

Ms. Spark documented another injury on the labia majora, explaining that the area of the injury was abraded and "very painful." When she later pressed a sterile gauze against the area for the rape kit, "yellow, serosanguineous fluid" flowed from the abrasion. She explained that the color of the fluid indicated the presence of protein in the blood before iron turns the blood red. Ms. Speck testified that she adjusted her examination process to avoid inflicting further pain on the victim.

Ms. Speck next documented a laceration, ten millimeters in length and two millimeters in width in the posterior fourchette, the small area between the vulva and the anus. Despite the victim's "multiple injuries," Ms. Speck found the laceration to be "significant" and "pretty long" given that the area was small. The laceration went through the skin and into fatty tissue and looked like an episiotomy, a cut or incision made to assist in childbirth. She agreed that the laceration could also be considered a rip or a tear. Ms. Speck's report noted that due to the laceration, the area was tender, and the victim was "unable to tolerate [a] speculum," a tool commonly used to examine the cervix. Ms. Speck testified that the victim also sustained a hymenal vaginal tear which went through the hymen into the vagina. The area of the tear was swollen and white in color indicating that the tear was recent.

Ms. Spark documented "bloody genital trauma" externally, internally, and in the vaginal tissue where the injuries were located except for the abrasion with the serosanguineous fluid. Ms. Spark testified that there was no menstrual bleeding, explaining that it was important to note the presence of menstrual bleeding because it would dilute any sampling collected for a rape kit.

Outside the genital area, the examination revealed bruising of the victim's right shoulder and the right deltoid and bilateral petechial abrasions on both thighs. Ms. Spark explained that petechiae are red spots indicating bleeding under the skin. The petechial abrasions on the inner side of both legs were significant and consistent with "the resistance from keeping the legs together[.]"

Ms. Speck swabbed the victim's vulva and vagina to examine for the presence of sperm or sexually transmitted diseases. Although DNA technology was unavailable, Ms. Speck testified that she took a known sample from the victim because it was part of the protocol for the collection of rape kits at the time.

Along with the pelvic exam and screening for sexually transmitted disease, the victim was screened for pregnancy and prescribed the morning-after pill. She was not screened for drugs, and Ms. Spark testified that had the victim exhibited signs of intoxication, she would have documented same in the report and would not have prescribed the morning-after pill.

Ms. Speck testified that the swab samples and the gauze strip she collected during the examination were dried and stored separately from each other to avoid cross-contamination. She described the procedure she followed in preparing the swabs and gauze strip for collection into the rape kit. Once the swabs and gauze strip were ready, they were placed in a sealed container along with the victim's underwear and pubic strands. Ms. Speck then placed the rape kit in a closet in a locked room next to her office for safekeeping. Ms. Speck was not involved in the delivery of the rape kit to law enforcement.

Danielle Reed, a senior DNA analyst at Bode Technology ("Bode"), a private forensic DNA laboratory specializing in the analysis of specimen samples for the development of DNA profiles, testified that she analyzed the swabs, seminal fluid on a gauze strip, and a pair of underwear from the victim's rape kit on April 22, 2015, after receiving the victim's rape kit from the Memphis Police Department ("MPD"). The items were delivered in a sealed container. Ms. Reed confirmed that a DNA profile consistent with the same male contributor was obtained from the vaginal swabs and the underwear. In 2015, Bode was not given a standard sample to compare to the DNA profile obtained from the vaginal swabs and the underwear. Her involvement in the case ended when she submitted the report of her analysis to the MPD.

Sergeant James Aylor, a twenty-year veteran officer in the MPD, testified that in 2018, he was assigned to the DNA unit which had been created to address the backlog of untested rape kits. Sergeant Aylor testified that the untested rape kits were sent to one of two private laboratories, Bode or Sorenson, for DNA analysis. He testified that if a DNA profile was generated from the samples of the rape kit, the samples would then be re-tested. Once the private lab results were verified, the resulting DNA profile would be entered into CODIS, a database of DNA profiles.

Sergeant Aylor was assigned to the victim's case. He recalled pulling the case file to determine whether the victim or any persons relevant to the case were still alive. He testified that the DNA profile generated from the victim's vaginal swabs and underwear matched Defendant's DNA profile on the CODIS database. The male DNA profile from the swabs and underwear were also consistent with the DNA profile from Defendant's buccal swabs. Sergeant Ayler submitted a report of his investigation to the District Attorney's Office. When he was notified to proceed in the case, he visited the victim at her home with another detective and a Rape Crisis advocate. Sergeant Ayler asked the victim whether she recalled the incident in 1988. When she replied that she did, he informed her that a suspect had been identified. He recalled that the victim's demeanor changed dramatically; she began shaking and smoked a cigarette to help calm her shaking.

Sergeant Ayler testified that the victim was not asked to give another statement because her original statement was "pretty solid." His visit to the victim was to notify her

that a suspect had been implicated. He gave the following reason for not seeking a secondary statement from the victim:

> I think that that's re-victimizing the victim, and due to the fact of the nature of these cases involves a tremendous amount of trauma and mostly lifelong trauma for our victims that we – we certainly did not want to do that.

Aaron Kant, an investigator in the Shelby County District Attorney's Office, collected a DNA specimen sample from Defendant on June 7, 2022. He testified that Defendant's cheeks were swabbed. Mr. Kant identified Defendant as the person from whom he collected the buccal swab samples for testing in the victim's case.

Sandra Gault, another senior DNA analyst at Bode, tested the buccal swabs collected from Defendant in 2022 and compared the resulting DNA profile to the DNA profile generated from the swabs and underwear in the victim's rape kit collected by Ms. Reed in 2015. The DNA profile generated from Defendant's buccal swabs matched the DNA profile generated from the vaginal swabs and underwear in the victim's rape kit. Ms. Gault testified that the "probability of randomly selecting an unrelated individual with the same DNA profile is 1 and 6.2 quintillion in the U.S. population." The State then rested its case.

Defendant did not testify. The jury convicted Defendant of aggravated rape as charged.

Sentencing was held on March 7, 2024. Relying on *State v. Carico*, 968 S.W.2d 280, 286 (Tenn. 1998),[2] the trial court announced that Defendant would be sentenced under the present Sentencing Act instead of the Sentencing Act in place at the time of the rape because it was the least severe sentence between the two sentencing acts. The trial court noted that under the pre-1989 Sentencing Act, Defendant would have been sentenced to twenty-years to life for aggravated rape whereas under the present Sentencing Act, Defendant was looking at a range of punishment from fifteen to twenty-five years.

The State introduced certified judgment copies of Defendant's prior convictions which were admitted along with the presentence report without objection. The victim testified about the impact of the crime on her life. Defendant made an allocution in which he stated that he "had no idea" about the "incident complaint of rape" by the victim in 1988 and asserted that it was "virtually impossible" for him to put on an "equity defense"

---

[2] *State v. Carico*, 968 S.W.2d 280, 286 (Tenn. 1998) (holding the trial court was required to calculate the proper sentence under both the 1982 and the 1989 sentencing acts and then impose the least severe sentence where the commission of aggravated rape occurred prior to 1989, and the sentence was imposed after 1989).

because the State waited so long to indict him. He concluded his allocution by asking the trial court for "mercy" in determining his sentence. The trial court sentenced Defendant as a Range I offender to twenty-five years to be served 100% by operation of law. *Id.* § 40-35-501(i)(1), (2)(F).

The judgment was entered on the same day of sentencing, March 7, 2024. The deadline to file a timely motion for new trial was Monday, April 8, 2024. *See* Tenn. R. Crim. P. 33(b); 45(a)(2). Defendant filed his motion for new trial on April 16, 2024, in which Defendant alleged that the trial court erred in including aggravated assault as a lesser-included offense, the verdict was against the weight and sufficiency of the evidence, and the trial court erred in its application of enhancement factors at sentencing. Defendant's motion for new trial was heard on April 17, 2024, the day after the motion was filed. On the day of the hearing, Defendant filed an amended motion for new trial with an additional issue: the State's pre-indictment delay violated his right to due process.

The timeliness of the motion for new trial was not raised before or during the hearing on the motion. The trial court heard arguments of counsel focused solely on the new issue of pre-indictment delay and found that there was indeed a delay in indicting Defendant but that there was no proof that Defendant sustained actual prejudice from the delay nor that the State caused the delay to gain a tactical advantage.[3] The trial court denied the motion for new trial. The order denying the motion for new trial was entered April 17, 2024.

Defendant filed a notice of appeal on May 1, 2024. Because the deadline to file the notice of appeal was not extended by a timely filed motion for new trial, Defendant had until Monday, April 8, 2024, to file a timely notice of appeal. Tenn. R. App. P. 4(c). Defendant's notice of appeal filed on May 1, 2024, was untimely by twenty-three (23) days.

Defendant did not address the untimeliness of the motion for new trial or the notice of appeal in his brief. The State, in its brief, noted the untimeliness of the notice of appeal and the motion for new trial and moved to dismiss the appeal as its first issue. In response, Defendant filed a motion to accept the late-filed notice of appeal. Defendant's appeal and the motion to waive timely filing are now before this court.

---

[3] The trial court applied the "*Marion-Dykes* test" established in *United States v. Marion*, 404 U.S. 307 (1971), and *State v. Dykes*, 803 S.W.2d 250 (Tenn. Crim. App. 1990). Under the *Marion-Dykes* test, trial courts consider the length of the delay, whether the accused was prejudiced by the delay, and whether the State caused the delay to gain a tactical advantage in determining whether the delay violated due process.

- 8 -

**Analysis**

I. <u>Untimely Notice of Appeal – Waiver of Pre-Indictment Delay Issue</u>

We must first address the timeliness of Defendant's motion for new trial and appeal. The State argues that the interest of justice is not served by waiving the filing requirement for the late-filed notice of appeal because the nature of Defendant's issues lack merit. The State also argues that Defendant's pre-indictment delay issue is waived because of the untimely motion for new trial and the failure to file a pretrial motion to dismiss the indictment. Defendant seeks waiver on the grounds that he did not personally cause the pre-indictment delay.

To be considered timely, a motion for new trial must be filed within thirty days from the date the sentence is entered. Tenn. R. Crim. P. 33(b). The thirty-day period cannot be extended. Tenn. R. Crim. P. 45(b)(3). An untimely motion for new trial is therefore a nullity, and a trial court's consideration of an untimely motion on its merits does not affect the validity of the motion. *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997); *State v. Lowe-Kelley*, 380 S.W.3d 30, 34 (Tenn. 2012). The failure to file a timely motion for new trial waives plenary review of all appellate issues except sufficiency of the evidence and sentencing. *See* Tenn. R. App. P. 3(e); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989); *State v. Williams*, 675 S.W.2d 499, 501 (Tenn. Crim. App. 1984).

A notice of appeal must be filed "within [thirty] days after the date of entry of the judgment appealed from[.]" Tenn. R. App. P. 4(a). A timely filed motion for new trial will toll the time for filing a notice of appeal. Tenn. R. App. P. 4(c). Consequently, "an untimely motion for new trial also will result in an untimely notice of appeal." *State v. Rutherford*, No. E2019-00063-CCA-R3-CD, 2020 WL 587078, at *8 (Tenn. Crim. App. Feb. 5, 2020). Unlike the motion for new trial, the time for filing the notice of appeal to this court is not jurisdictional and may be waived in the "interest of justice." Tenn. R. App. P. 4(a); *Dodson*, 780 S.W.2d at 780.

When considering whether a waiver on an untimely notice of appeal is appropriate, "this court will consider the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular case." *State v. Rockwell*, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007). Also relevant is whether there has been a request for waiver. *Id.* (considering the State's failure to seek waiver of its untimely notice of appeal in determining whether the interest of justice would favor waiver); *State v. Manning*, No. E2022-01715-CCA-R3-CD, 2023 WL 7439203, at *6 (Tenn. Crim. App. Nov. 9, 2023) (finding defendant's failure to seek waiver was a relevant factor that weighed against waiver), *perm. app. denied* (Tenn. May 16, 2024). The appealing party "bears the responsibility to properly perfect his [or her] appeal

- 9 -

or to demonstrate that the 'interests of justice' merit waiver of an untimely filed notice of appeal." *State v. Thomas*, No. W2022-00109-CCA-R3-CD, 2023 WL 328337, at \*3 (Tenn. Crim. App. Jan. 20, 2023), *perm. app. denied* (Tenn. June 7, 2023); Tenn. R. App. P. 4(a).

In this case, it is undisputed that Defendant's motion for new trial was untimely filed on April 16, 2024. The judgment was entered on March 7, 2024; the deadline to file a timely motion for new trial was Monday, April 8, 2024. *See* Tenn. R. Crim. P. 33(b); 45(a)(2). The trial court's hearing and order denying the motion for new trial did not extend the time for Defendant to file a notice of appeal. Thus, Defendant's deadline to file his notice of appeal was Monday, April 8, 2024. *See* Tenn. R. App. P. 4(a); 21(a). Defendant's notice of appeal, filed on May 1, 2024, was therefore also untimely filed.

Following the State's responsive brief in this case, Defendant filed a motion to excuse the late-filed notice of appeal, stating that trial counsel inadvertently missed the date for timely filing the motion for new trial and that the late filing was not the fault of Defendant. Defendant asked this court to waive the timely filing of the notice and address Defendant's sufficiency claim. Upon consideration of the *Rockwell* factors, we elect to grant Defendant's motion and waive the timely filing requirement in the interest of justice. *See* Tenn. R. App. P. 4(a). This was a violent rape case which remained unsolved for thirty years until the victim's rape kit was finally tested and implicated Defendant. *See State v. Williams*, No. M2007-01385-CCA-R3-CD, 2009 WL 564231, at \*10 (Tenn. Crim. App. Mar. 5, 2009) (electing to waive timely filing of a notice of appeal "[g]iven the gravity of the crime [first degree premeditated murder] as well as the magnitude of the punishment [life sentence]"). We find that the nature and circumstances of the convicted offense weigh in favor of waiver.

Defendant's brief raises two issues: that the pre-indictment delay violated his right to due process and that the evidence was insufficient to support his conviction. We agree with the State that the pre-indictment delay issue is waived because of the late-filed motion for new trial. However, we will review Defendant's sufficiency argument. *Dodson*, 780 S.W.2d at 780; *Williams*, 675 S.W.2d at 501.

## II. Sufficiency of the Evidence

On appeal, Defendant contends that DNA evidence alone is insufficient to identify him as the attacker, and because the DNA evidence was the only evidence connecting him to the crime, it was insufficient to support the conviction of aggravated rape. The State contends Defendant's attack on the DNA evidence goes to the weight of the evidence which is strictly a question for the jury. We agree with the State.

Aggravated rape is defined, in relevant part, as the "unlawful sexual penetration of a victim by the defendant" that is accompanied by "[f]orce or coercion . . . and the defendant is armed with a weapon," or when the defendant causes bodily injury to the victim.[4] T.C.A. § 39-13-502(a)(1), (2).

Identity is an essential element of every crime. *State v. Hardison*, 680 S.W.3d 282, 319 (Tenn. Crim. App. 2023). "Identity may be established by circumstantial evidence alone." *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2023) (citing *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002)). Because identity is a question of fact to be resolved by the jury, on appeal, the State is entitled to the strongest legitimate proof of identity. *Hardison*, 680 S.W.3d at 319 (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). "Identity is a question of fact for the jury's determination upon consideration of all competent proof." *Id.* (citing *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005)).

Several panels of this court have held that in certain circumstances, DNA evidence alone may be sufficient to support a conviction where the victim is unable to identify the perpetrator. *See State v. Toomes*, 191 S.W.3d 122, 131 (Tenn. Crim. App. 2005) (concluding that the State had sufficiently proven defendant's identity as the rapist from only DNA evidence where the victim was unable to identify her attacker, but defendant's identical twin was incarcerated at the time of the rape); *State v. Lindsey*, No. W2018-01987-CCA-R3-CD, 2020 WL 774047, at *5-6 (Tenn. Crim. App. Feb. 14, 2020) (concluding that defendant's DNA match with oral and "miscellaneous" swabs was sufficient to establish his identity as the rapist although the victim's description of the rapist was somewhat inconsistent with the defendant's appearance); *State v. Burdick*, No. M2010-01726-CCA-R3-CD, 2012 WL 2160243, at *4-5 (Tenn. Crim. App. June 13, 2012) (concluding that evidence of the defendant's DNA match of the sperm taken from a swab of one of the victim's labia was sufficient to establish defendant's identity as the rapist where both victims were bound and their eyes covered with duct tape and therefore unable to identify the attacker).

Here, the jury weighed the DNA evidence and found it reliable and accurate to identify Defendant as the man who raped the victim. The victim, while unable to identify her assailant, reported that the man threatened to slash her throat and ejaculated during the rape. The victim was examined, and several specimens were collected from her body and included in the rape kit along with her underwear. Although it was almost thirty years before the rape kit was tested, there was no proof that its contents had been contaminated, cross-contaminated, or degraded due to the passage of time, mismanagement, or broken

---

[4] The only distinction between the 1988 definition of aggravated rape and the present definition is that in 1988, "bodily injury" replaced "personal injury." T.C.A. § 39-2-603 (1988).

chain of custody. Thus, the DNA profile from the rape kit existed decades before its association with Defendant's DNA.

When that association did occur, Defendant's DNA was retested with a new sample to confirm the match. Preliminary analysis of the evidence collected from the victim developed a DNA profile of one male contributor. The profile from the rape kit later matched Defendant's DNA profile on the CODIS database. The DNA profile from the rape kit was re-tested and compared with new samples from Defendant. The buccal swabs collected from Defendant in 2022 again matched the DNA profile generated from the samples and underwear in the rape kit. The analyst who compared Defendant's new sample with the rape kit sample testified that the likelihood of the profile matching someone other than Defendant was "1 and 62 quintillion." There was no proof that the analysis conducted by the two DNA experts from Bode was unreliable or inaccurate. The DNA expert from Bode who generated the DNA profile in 2015, and the DNA expert who compared the DNA profile to Defendant's buccal swabs in 2022, testified as experts without objection.

Based on the proof, it was reasonable for the jury to conclude that Defendant was the man who raped the victim causing her bodily injury. Defendant is not entitled to relief.

## Conclusion

Based on the foregoing, Defendant's motion to accept late-filed notice of appeal is granted and the judgment of the trial court is affirmed.


s/ *Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE